**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| SERGIO GROBLER, derivatively on behalf of INOTIV, INC., | **Case No:**   4:22-cv-64 |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| ROBERT W. LEASURE, BETH A. TAYLOR, GREGORY C. DAVIS, R. MATTHEW NEFF, RICHARD A. JOHNSON, JOHN E. SAGARTZ, NIGEL BROWN, and SCOTT CRAGG, | <u>JURY TRIAL DEMANDED</u> |
| Defendants, | |
| and | |
| INOTIV, INC., | |
| Nominal Defendant. | |

Plaintiff Sergio Grobler ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Inotiv, Inc.[1] ("Inotiv" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Robert W. Leasure, Beth A. Taylor, Gregory C. Davis, R. Matthew Neff, Richard A. Johnson, John E. Sagartz, Nigel Brown, and Scott Cragg (collectively, the "Individual Defendants" and with Inotiv, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Inotiv, gross mismanagement, abuse of control, waste of corporate assets, and violation of Section 14(a) of the Securities

---

[1] In March 2021, Bioanalytical Systems, Inc. changed its name to Inotiv, Inc.

1

Exchange Act of 1934 ("Exchange Act"). As for his complaint against Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' public documents and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Inotiv, news reports, securities analysts' reports and advisories about the Company, the proceedings in the action styled *United States of America v. Envigo RMS, LLC*, case no. 6:22-cv-00028-NKM (W.D. Va.) (the "*Envigo* Action"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action which seeks to remedy wrongdoing committed by Inotiv's directors and officers between September 21, 2021 and July 14, 2022, inclusive (the "Relevant Period").

2.      Nominal Defendant Inotiv is a contract research organization which provides nonclinical and analytical drug discovery and development services and research models and related products and services. Inotiv's mission is to provide drug and product developers with superior scientific research and innovative analytical instruction in order to bring new drugs to market quickly.

3.      Prior to the Relevant Period, in May 2021, discussions began about a business combination between Inotiv and Envigo RMS Holding Corp. ("Envigo"), a company that provides research-quality animals for use in laboratory testing for contract research organizations,

biopharmaceutical companies, universities, governments and other research organizations. Envigo provides its customers with laboratory animals, including dogs such as beagles, used in basic research and product development and non-clinical testing of compounds to support the development of medicines. Envigo has facilities throughout the country and a few overseas, including one in Cumberland, Virginia (the "Cumberland Facility").

4.      Envigo is subject to state and federal rules and regulations concerning its operation and treatment of animals. In particular, Envigo must abide by the Animal Welfare Act ("AWA") (7 U.S.C. §2131) which "requires that minimum standards of care and treatment be provided for certain animals bred for commercial sale; used in research, teaching, or testing; transported commercially; or exhibited to the public."[2]

5.      The Cumberland Facility housed thousands of beagles which were subjected to unnecessary and illegally inhumane treatment.

6.      On May 5, 2021, Defendant Leasure and Adrian Hardy ("Hardy"), the Chief Executive Office ("CEO") of Envigo, held a phone call to discuss a combination between Inotiv and Envigo. After numerous meetings and discussions over the course of several months, the Board of Directors for Inotiv (the "Board") and Envigo reached an agreement about a merger.

7.      Between May 2021 and September 2021, the Individual Defendants purportedly conducted due diligence in furtherance of a merger. This due diligence included extensive meetings and calls between Inotiv and Envigo, as well as with investment banks, reviewing materials about Envigo's business, and visits to Envigo's facilities.

_____

[2] https://www.nal.usda.gov/animal-health-and-welfare/animal-welfare-act .

8.      On September 21, 2021, Inotiv, two of its subsidiaries, and Envigo entered into an agreement in which Envigo would merge with Inotiv's subsidiaries resulting in Envigo being the surviving entity as a wholly-owned subsidiary of Inotiv (the "Merger").

9.      However, while the merger discussions were underway, unbeknownst to Inotiv shareholders, beginning in at least July 2021, Envigo was subject to increasingly intense regulatory scrutiny due to its Cumberland Facility. This scrutiny would result in, among other things, the closure of the Cumberland Facility, the transfer of all remaining beagles from the Cumberland Facility to the Humane Society of the United States, and also detrimental publicity caused by the wrong-doing of the handling of beagles at the Cumberland Facility. Importantly, the severe issues at the Cumberland Facility were clear and actively under investigation during the Individual Defendants' purported due diligence which included site visits. As opposed to the humdrum mentions of investigations into Envigo and Inotiv's due diligence into Envigo, including its site visits from July 20, 2021 through August 20, 2021 including in Virginia, the real facts regarding Envigo and its Cumberland Facility were disturbing, inhumane, and would lead to the aforementioned actions as well as significant negative press coverage.

10.     On October 5, 2021, Inotiv filed a proxy statement (the "Proxy Statement") in advance a special meeting of shareholders being held on November 4, 2021, regarding a shareholder vote on conditions required for the Merger's completion.

11.     The Proxy Statement discussed details of the potential Merger, including the background of due diligence conducted by Inotiv's Board. The Proxy Statement explained that the Merger could not be consummated without Inotiv shareholders voting to: (i) authorize amendments to the Second Amended and Restated Articles of Incorporation to increase the

number of authorized shares of both common shares and preferred shares; and (ii) authorize the issuance of the common shares pursuant to NASDAQ Rules 5635(a).

12.     The Proxy Statement was materially false and misleading as it failed to disclose to Inotiv shareholders that Envigo's operations did not comply with federal and state regulations concerning animal welfare, such as the AWA, and that Envigo's operations, specifically at its Cumberland Facility, were so egregious that it would be shuttered. Further, the Proxy Statement was materially false and misleading because it claimed that the Individual Defendants conducted due diligence into Envigo's business and operations. Indeed, the Proxy Statement informed Inotiv shareholders that Defendants Leasure and Sagartz conducted site visits of Envigo's facilities. If proper due diligence of Envigo was actually and/or adequately conducted by Defendants, then Inotiv would not be facing the reputational and financial harm the conditions at the Cumberland Facility caused Inotiv. The Proxy Statement failed to properly inform Inotiv shareholders of the liabilities and harm the Merger could – and did – cause Inotiv and its business.

13.     After the shareholder meeting the previous day, on November 5, 2021, Inotiv, completed its purchase of Envigo.

14.     On May 20, 2022, the truth about the conditions of the Cumberland Facility began to come to light with Inotiv filing a Form 8-K with the SEC that disclosed that government agencies executed a search and seizure warrant on the Cumberland Facility and announced the filing of the *Envigo* Action.

15.     On May 21, 2022, Judge Norman K. Moon of the United States District Court for the Western District of Virginia issued an *ex parte* amended temporary restraining order in the *Envigo* Action, in which he concluded, in part, that:

*This Court now concludes that the Government has provided sufficient evidence that Envigo is engaged in serious and ongoing violations of the Animal Welfare Act, and that an immediate temporary restraining order must issue to put a halt to such violations pending further proceedings.*

*Over 300 beagle puppies have died onsite due to "unknown causes" over seven months. Many were not given anesthesia before they were euthanized by intracardiac injection.* Beagles with even minor injuries or easily treated medical conditions were euthanized rather than given veterinary care. *Nursing female beagles were denied food, and so they (and their litters) were unable to get adequate nutrition.* The food that the beagles did receive was observed to contain live insects, worms, maggots, beetles, flies, ants, mold, and feces.

Beagle puppies remained housed in their enclosures as they were hosed down with cold water, leaving them shivering. *Over an eight-week period, 25 beagle puppies died from cold exposure.*

\*          \*          \*

*The Government contends that Envigo has consistently failed, despite repeated warnings and opportunities for correction, to meet its obligations under AWA's [the Animal Welfare Act] implementing regulations to provide adequate veterinary care. See* Dkt. 2-1 pp. 10–11. *Based on the overwhelming evidence produced by the Government, the Court agrees.*

(Emphasis added.)

16.     On June 17, 2022, Judge Moon granted, in part, the Government's preliminary injunction request noting the ongoing AWA violation stating that: "[o]verwhelming evidence of Defendant's AWA violations, and of the irreparable harm that would result without intervention by the Court, was detailed in the Court's order date May 21, 2022. S*ee* Dkt. 6 pp. 5–19. But the Government has since supplemented its evidence with affidavits showing that Defendant remains in violation of the AWA as of June 8. *See e.g.*, Dkt. 17-4 ¶ 32[.]"

17.     Inotiv's stock price declined upon these revelations. The loss of reputation and goodwill is severe as well. The facts of the Cumberland Facility are so stark that national, local, international, and even collegiate outlets have substantially covered this issue—including, but certainly not limited to, the *BBC*, *The New York Times*, *Chicago Tribune*, *CNN*, *ABC News*, *Inside*

*Indiana Business*, *WLFI 18*, *WFYI Indianapolis*, *FOX 55 Fort Wayne*, *WANE 15*, and the *Purdue Exponent*. As reported by *The Los Angeles Times*, *Washington Post*, *People*, *Vanity Fair*, and others, the egregious conditions at the Cumberland Facility attracted the attention of Prince Harry and Meghan, Duchess of Sussex, among many others, who have adopted beagles from the Cumberland Facility.

## JURISDICTION AND VENUE

18.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of Indiana or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Subject matter jurisdiction is also conferred by 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

21.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and

the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

24.     Plaintiff is a current shareholder of Inotiv. Plaintiff has been, and continues to be, a shareholder of Inotiv common stock during the Relevant Period. Plaintiff is a resident of Florida.

25.     Nominal Defendant Inotiv is an Indiana corporation with its head office is located at 2701 Kent Avenue, West Lafayette, Indiana 47906. Inotiv purports to be a contract research organization which provides nonclinical and analytical drug discovery and development services and research models and related products and services. On November 5, 2021, Inotiv completed the acquisition of Envigo which is now a direct, wholly-owned subsidiary of Inotiv.

26.     Defendant Robert (Bob) W. Leasure, Jr. ("Leasure") has served as the Company's CEO, President, and as a Director since January 2019. On information and belief, Defendant Leasure is a resident of Indiana.

27.     Defendant Beth A. Taylor ("Taylor") has served as the Company's Chief Financial Officer and Vice President of Finance since March 2020. On information and belief, Defendant Taylor is a resident of Indiana.

28.     Defendant Gregory C. Davis ("Davis") has served as the Company's Chairman of the Board since June 2017. Defendant Davis serves on Inotiv's Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. On information and belief, Defendant Davis is a resident of Indiana.

29.     Defendant R. Matthew Neff ("Neff") has served as a Director of the Company since August 2017.  Defendants Neff is the Chair of the Audit Committee and a member of the Compensation Committee. On information and belief, Defendant Neff is a resident of Indiana.

30.     Defendant Richard A. Johnson ("Johnson") has served as a Director of the Company since May 2012. Defendant Johnson is the Chair of the Nominating and Corporate Governance Committee and is a member of the Audit Committee and Compensation Committee. On information and belief, Defendant Johnson is a resident of Michigan.

31.     Defendant John E. Sagartz ("Sagartz") has served as a Director of the Company since July 2018. Defendant Sagartz is also Inotiv's Chief Strategy Officer. On information and belief, Defendant Sagartz is a resident of Missouri.

32.     Defendant Nigel Brown ("Brown") has served as a Director of the Company since November 2021. Defendant Brown serves on the Audit Committee and Nominating and Corporate Governance Committee. On information and belief, Defendant Brown is a resident of New Jersey.

33.     Defendant Scott Cragg ("Cragg") has served as a Director of the Company since November 2021. Defendant Cragg is the Chair of the Compensation Committee. On information and belief, Defendant Cragg is a resident of New York.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers, directors and/or fiduciaries of Inotiv and because of their ability to control the business and corporate affairs of Inotiv, the Individual Defendants owed Inotiv and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Inotiv in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Inotiv and its shareholders so as to benefit all shareholders equally.

35.     Each director and officer of the Company owes to Inotiv and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inotiv, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

37.     To discharge their duties, the officers and directors of Inotiv were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

38.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

39.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Inotiv, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware of posed a risk of serious injury to the Company.

40.     Specifically, the Individual Defendants caused Inotiv to issue false and misleading statements of material fact in the Company's public statements relating to its purchase of Envigo, including in its: September 21, 2021 current report filed on Form 8-K, with attachments; Proxy Statement; its November 5, 2021 press release entitled "Inotiv, Inc. Completes Purchase of

Envigo"; annual report for the year ending September 30, 2021, filed on Form 10-K; and May 16, 2022 quarterly report filed on Form 10-Q.

41.     The Individual Defendants' conduct, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised Inotiv's Board at relevant times. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Inotiv to issue false and misleading statements of material fact in the Company's statements relating to the Merger and failed to protect corporate assets.

42.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects including potential purchases, so that the market price of Inotiv's stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Inotiv to make false and misleading statements of material fact in the Company's statements regarding the Merger, before and after closing.

43.     To discharge their duties, the officers and directors of Inotiv were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Inotiv were required to, among other things:

(a)      ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Indiana, the United States, and pursuant to the Inotiv's own Global Code of Business Conduct and Ethics and internal guidelines;

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Inotiv conducted its operations and plans, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Inotiv and potential acquisitions, procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Inotiv's operations would comply with all laws and Inotiv's statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      examine and evaluate any reports of examinations, audits, or other financial information concerning the affairs of the Company, including potential combinations and

purchases, and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above; and

(h)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

44.      Each of the Individual Defendants further owed to Inotiv and the shareholders the duty of loyalty requiring that each favor Inotiv's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

45.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Inotiv and were at all times acting within the course and scope of such agency.

46.      Because of their advisory, executive, managerial, and directorial positions with Inotiv, each of the Individual Defendants had access to adverse, non-public information about the Company and potential purchases including the ongoing violations of the AWA.

47.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Inotiv.

48.      In addition, the Individual Defendants' actions and conduct has subjected the Company to at least the *Envigo* Action and a federal securities fraud class action lawsuit pending in this Court ("Securities Class Action"). Additionally, the Individual Defendants' actions caused Inotiv to close multiple facilities and face severe reputational harm. As a result, Inotiv has expended, and will continue to expend, substantial sums of money to rectify the Individual Defendants' wrongdoing as well as lose potential business and goodwill.

## <u>CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION</u>

49.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.    During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct of the Merger despite the investigations and disturbing details of the Cumberland Facility, and to issue false and misleading statements of material fact that failed to disclose and misrepresented adverse facts that were known to the Individual Defendants or were recklessly disregarded by them at the time they were made, including that the Company caused Inotiv to make false and misleading statements of material fact in the Company's statements relating to the Merger before and after closing the deal. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein.

51.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused Inotiv to make false and misleading statements of material fact in the Company's statements relating to the Merger.

52.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) disguise and misrepresent the valuation of the Company; and (2) artificially inflate the Company stock price.

53.     Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Inotiv and was at all times acting within the course and scope of such agency.

## GLOBAL CODE OF BUSINESS CONDUCT AND ETHICS

56.     The conduct of all of the Company's officers, directors, and employees is governed by its Global Code of Business Conduct and Ethics (the "Code of Ethics").

57.     The Code of Ethics states, as part of its introduction which is signed by Defendant Leasure, in pertinent part:

> ***Complying with the Code of Business Conduct and Ethics is not an option; rather, it is an obligation. We will always follow the law***, embrace diversity of people and thought, treat all people with dignity and respect, avoid conflicts of interest, compete fairly, protect our planet/environment and act responsibly.
>
> \*       \*       \*
>
> Remember to do the right thing and speak up if something isn't right. The Code of Business Conduct and Ethics is not a substitute for your good judgment, and it cannot cover every conceivable situation. You should ask yourself three simple questions if you have any doubts about what you should do:

• *How would this decision look to others within Inotiv and externally?*
• Am I willing to be held accountable for this decision?
• Is this consistent with the spirit of Inotiv's Code of Business Conduct and Ethics, and its policies?

(Emphasis added.)

58.     The Code of Ethics' second section is entitled "Looking After our People, our Customers and our Animals" and the first subsection is entitled "Animal Welfare". The Animal Welfare subsection states the following:

At Inotiv, we are committed to globally implementing the highest standards of animal welfare.

Our animal welfare policy brings a harmonized approach to ethically conducting biomedical research through:

> • *actively fostering a culture of caring at all levels towards the animals at Inotiv*;
> • *complying with all applicable national and local regulations with regard to the care and use of animals within our facilities*;
> • *achieving the highest standards of animal welfare* whilst attaining the scientific objectives of the studies conducted and breeding performed;
> • advocating for and implementing the 3R principles of 'Reduction, Refinement and Replacement'; and
> • fostering and encouraging the application of these objectives within our customer community and to the scientific community at large.

*Any employee who observes an animal procedure or treatment which is perceived as noncompliant with Inotiv's policies or standard operating procedures, must immediately report the relevant concerns in as much detail as possible* to their local animal welfare representative, supervisor, facility leader, the local IACUC representative (United States only), or the Inotiv Integrity Helpline (https://www.inotivco.com/about/ethics-andcompliance/).

(Emphasis added.)

59.     In violation of the Code of Ethics, the Individual Defendants (as Inotiv officers and/or as members of the  Board) conducted little, if any, oversight of the Merger and consciously disregarded their duties to monitor such dealings and protect corporate assets and animal welfare before and after closing the Merger. The Individual Defendants' complete failure to perform their

duties in good faith resulted in misrepresentations to the investing public and the Company's shareholders, and in engagement in conduct that was not in the best interest of the Company.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background of the Merger*

60.     In November 2019, Defendant Leasure began to discuss with Defendant Cragg, then a director of Envigo, about potential opportunities for Inotiv's business in furtherance of Inotiv's efforts to assess potential strategic opportunities.

61.     By April 2021, Defendants Leasure and Cragg participated on several calls with each other and representatives from Bank of America Securities in an effort to determine ways in which Inotiv and Envigo could potentially work with one another. By the end of April 2021, Defendant Cragg introduced Defendant Leasure to Hardy, Envigo's former CEO and now Executive Vice President.

62.     Further discussions ensued and by May 5, 2021, Defendant Leasure and Hardy, participated on a phone call to discuss a combination between Inotiv and Envigo. Between May 16, 2021 and May 21, 2021, Inotiv and Envigo entered into a Mutual Non-Disclosure Agreement in further steps of a business combination between the two entities. On May 24, 2021, Hardy supplied Leasure with Envigo's Corporate Overview which provided more detail about Envigo's business.

63.     On June 16, 2021, Defendant Leasure received an updated analysis about a business combination from Bank of America. Defendant Leasure shared this presentation with the Board. At the time, Defendants Leasure, Davis, Neff, Johnson, and Sagartz were on the Board. The following day, on June 17, 2021, Defendants Leasure and Sagartz met with Defendant Cragg and non-parties Hardy and Jim Harkness ("Harkness") (Envigo's Chief Operating Officer), in

person in New York City to discuss the Company's strategic vision, Envigo's revenue and growth potential, and the logic for combining the two companies. Defendant Cragg, non-parties Hardy, and Harkness provided Defendants Leasure and Sagartz with a corporate overview of Envigo which included aspects such as strategy, operations, financial position marketing and business development, and commercial agreements. After Defendants Leasure and Sagartz provided similar information about Inotiv, Defendants Leasure and Cragg discussed potential valuations and deal structures.

64.     On July 2, 2021, Defendant Leasure provided the members of the Board an update on the status of due diligence and potential deal structure for Envigo. At the time, Defendants Leasure, Davis, Neff, Johnson, and Sagartz were members of the Board.

65.     On July 7, 2021, Defendant Leasure held a call with the Board where he updated the Board members, including Defendants Davis, Neff, Johnson, and Sagartz, on recent strategy discussions about a merger and acquisition including developments with Envigo.

66.     After a few days of receiving updated draft proposals from Bank of America Securities and Collier Securities, on July 10, 2021, Defendant Leasure provided the Board members (including Defendants Davis, Neff, Johnson, and Sagartz) about the recent discussions with Envigo and the interactions with the investment banks.

67.      On July 12, 2021, Defendant Leasure emailed an initial non-binding indication of interest letter to Defendant Cragg.

68.     On July 14, 2021, after receiving documents and emails from Bank of America, Defendant Leasure met with Defendant Cragg and Hardy again in New York to discuss strategic issues related to the proposed transaction, including due diligence issues.

69.     On July 18, 2021, Defendant Cragg sent comments of the indication of interest letter to Defendant Leasure. On July 19, 2021, Defendant Leasure provided the Board (including Defendants Davis, Neff, Johnson, and Sagartz) with another update of the status of the proposed merger with Envigo, including comments on the draft indication of interest and exclusivity agreement from Envigo.

70.     On July 20, 2021, Defendants Leasure and Sagartz began a due diligence tour to visit multiple Inotiv and Envigo sites. Site visits to Envigo's facilities, including in Virginia, continued until August 20, 2021.

71.     On August 1, 2021, Defendant Leasure provided the Board (including Defendants Davis, Neff, Johnson, and Sagartz) with updates on the potential Merger.

72.     On August 4, 2021, Inotiv, Envigo and their respective advisors began due diligence investigations, which continued until the signing of the Merger Agreement.

73.     On August 16, 2021, Inotiv received the exclusivity agreement from Envigo, which Inotiv countersigned that day.

74.     On August 20, 2021, Defendant Leasure updated the Board (including Defendants Davis, Neff, Johnson, and Sagartz) on the status of the transaction and due diligence.

75.     Additional Board meetings were held on several times in September, including one in which management was not in attendance, to continue dissing the Merger. The Individual Defendants purported to continue their due diligence until September 21, 2021, when the Board held a special meeting to finalize the Merger.

76.     On September 21, 2021, Inotiv issued a press release announcing that it entered into an agreement to purchase Envigo.

77.     On November 4, 2021, a special meeting of shareholders was held where Inotiv shareholders approved an increase in Inotiv's authorized shares and the issuance of Inotiv common shares to the stockholders and option holders of Envigo in connection with the Merger. Also at the special meeting, the Company's shareholders approved proposals to increase the number of shares available for awards under Inotiv's equity incentive plan and to authorize the issuance of Common Shares issuable upon conversion of the Company's 3.25% Convertible Senior Notes due 2027.

78.     On November 5, 2021, Inotiv announced in a press release that it had completed its purchase of Envigo. The press release discussed the final consideration for the Merger, stating in part:

> The aggregate consideration paid to the holders of outstanding capital stock in Envigo in the merger consisted of cash consideration of $271.0 million, including adjustments for net working capital and cash balances as provided in the merger agreement of approximately $13.0 million and $48.0 million, respectively, and 9,036,538 Inotiv common shares. The common shares included in the merger consideration include 790,620 shares issuable upon the exercise of certain Envigo stock options that were assumed by the Company in the transaction.

79.     Meanwhile, beginning at least in July 2021, Envigo was on notice by federal authorities that "the conditions at its Cumberland facility fall far below the AWA's minimum standards[.]" *Envigo*, Dkt. No. 1 at 2.

80.     In contrast to Inotiv's routine statements (described in more detail below), Envigo was the subject of intense and increasing regulatory scrutiny due to the Cumberland Facility which would result in, among other things, the closure of the Cumberland Facility, the transfer of all remaining beagles from the Cumberland Facility to the Humane Society of the United States, and also the detrimental publicity of its (mis)handling of beagles at the Cumberland Facility.

81.     Importantly, the severe issues at the Cumberland Facility were clear and actively under investigation during the Individual Defendants' purported due diligence of Envigo prior to the Merger. Inotiv's statements, when even mentioning this issue, downplayed it to an amazing degree.

## False and Misleading Statements During the Relevant Period

### *September 21, 2021 Form 8-K*

82.     On September 21, 2021, during market hours, Inotiv filed with the SEC a current report on Form 8-K. The Form 8-K included an investor presentation which touted Envigo and its animal services and abilities. The presentation included the following slides about Envigo's business:



83.     Also attached to the September 21, 2021 Form 8-K was a press release entitled "Inotiv, Inc. and Envigo Propose to Join Forces to Enhance Research and Drug Discovery

Solutions", that was also attached to the above-mentioned Form 8-K, which stated the following, in pertinent part, regarding Envigo and touting its animal services and abilities:

> "***Envigo has a long history and broad expertise*** supplying critical research models and services to the scientific community," said Envigo CEO, Adrian Hardy. "Our diverse client base of CROs, pharmaceutical, government and academic institutions and Inotiv's biopharma clients will be able to utilize leading research models and services from Envigo, including genetically engineered models and services (GEMS), contract breeding services, Teklad laboratory animal diets, surgical services, custom antibody services, and large and small research models.

> (Emphasis added.)

84.     The September 21, 2021 Form 8-K, particularly the presentation and press release attached thereto, was false and misleading as it was silent on the conditions of Envigo's facilities, including the severe and known issues at the Cumberland Facility. At the time of the publication of the Form 8-K, Envigo was already the target of governmental investigations regarding the conditions of its facilities and violations of state and federal laws. Thus, the Individual Defendants were aware of, or should have been aware of, the legal exposure, reputational harm, and operational harm caused by Envigo's facilities.

***October 5, 2021 Proxy Statement***

85.     On October 5, 2021, Inotiv filed with the SEC a proxy statement on Schedule 14A pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3] The Proxy Statement was filed in connection with a special meeting of shareholders to vote on conditions necessary to effectuate the merger of Inotiv and Envigo.

---

[3] Plaintiff's allegations with respect to the misleading statements in the Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

86.     The Proxy Statement included letters to shareholders from signed by Defendants Leasure and Taylor.

87.     The Proxy Statement stated that the Merger between Inotiv and Envigo required Inotiv shareholders to consider, in relevant part, "proposals to (i) amend our articles of incorporation to increase the number of our authorized shares to an amount that would be sufficient to allow the consummation of the Merger and (ii) approve the issuance of the common shares to be issued pursuant to the Merger Agreement. The consummation of the Merger is conditioned on the approval of both of these proposals by our shareholders."

88.     The Proxy Statement solicited Inotiv shareholders to vote in the affirmative, stating that the Board's recommendations as:

**Recommendation to the Inotiv Shareholders**

> *The Board believes that each of the Authorized Share Increase Proposal, the Merger Share Issuance Proposal*, the EIP Amendment Proposal, the Notes Share Issuance Proposal and the Adjournment Proposal *to be presented at the Special Meeting is in the best interests of Inotiv and Inotiv's shareholders and unanimously recommends that its shareholders vote "FOR" the Authorized Share Increase Proposal, "FOR" the Merger Share Issuance Proposal*, "FOR" the EIP Amendment Proposal, "FOR" the Notes Share Issuance Proposal and "FOR" the Adjournment Proposal.

(Emphasis added).

89.     While elaborating upon the reasons for the Merger and the share issuance, the Proxy Statement stated, in part, that the:

> In evaluating the Merger, the Board consulted with Inotiv management, as well as Inotiv's legal and financial advisors, and, in reaching its conclusion, considered a variety of factors, including:
>
> - The Board's knowledge of Inotiv's business, operations, financial condition, earnings and prospects and of Envigo's business, operations, financial condition, earnings and prospects, taking into account the results of Inotiv's due diligence review of Envigo …

- The Board's consideration of certain other factors, including historical information concerning Inotiv's and Envigo's respective businesses, financial conditions, results of operations, earnings, management, competitive positions and prospects on a projected combined basis and the current and prospective business environment in which Inotiv and Envigo operate, including price levels and volatility, economic conditions, the competitive and regulatory environment and the likely effect of these factors on Inotiv.

90.     The Proxy Statement described Envigo and stated the following, in pertinent part,

regarding Inotiv's due diligence of Envigo and touting Envigo's animal services and abilities:

**Envigo Overview**

***Envigo is primarily a products business that provides research-quality animals*** for use in laboratory tests, as well as standard and custom laboratory animal diets and bedding and other associated services for contract research organizations, biopharmaceutical companies, universities, governments and other research organizations. ***It provides customers with laboratory animals used in basic research and product development and non-clinical testing of compounds to support the development and approval of new medicines.*** Utilizing its portfolio of products, Envigo enables its customers to create a more flexible product development model and reduce their costs, enhance their productivity, and increase speed to market. ***Envigo's vision, working together to build a healthier and safer world, includes helping its customers meet certain regulatory requirements*** in order to bring life-saving and life-enhancing new medicines to patients.

Envigo is a leading commercial provider of RMS [Research Models and Services] products and services globally and has been supplying research models since 1931. …

Envigo's RMS business is comprised of (1) Research Models, (2) Diets and Bedding, and (3) Research Model Services.

*Research Models.* The research models business is comprised of the commercial production and sale of laboratory animals and research models, principally purpose-bred rats and mice and large animal models (NHPs, canines and rabbits) for use by researchers. Envigo provides models to numerous customers around the world, including many academic institutions, government agencies, biopharmaceutical companies, and contract research organizations. Envigo has a global footprint with production facilities strategically located in six countries. ***Its operations are located in close proximity to its customers, enabling Envigo to provide consistent customer service with a high degree of focus on animal welfare.***

                              *       *       *

*Large Research Models*. **Envigo's large animal portfolio includes non-human primates, which we call "NHPs", canines and rabbits**. … **Canines are purpose-bred in the U.S. and used primarily for the safety testing of new chemical therapies.**

                              *       *       *

**Between July 20, 2021 and August 20, 2021, Mr. Leasure and Dr. Sagartz visited Envigo locations in** Missouri, **Virginia**, Maryland, Pennsylvania, Texas, San Francisco, Indiana, Wisconsin, The Netherlands and England.

(Emphasis added.)

91.     The Proxy Statement contained several risk factors relating to the Merger. These risk disclosures, however, were inadequate as they merely listed failure to comply with governmental regulations as a potential risk in the abstract, without discussing the severe, ongoing governmental investigations into Envigo's violations, stating the following, in pertinent part:

**Legal and Regulatory Risk Factors**

**Failure to comply with applicable governmental regulations could harm our business.**

**Envigo is subject to a variety of governmental regulations, particularly in the United States**, Europe, and the United Kingdom, **relating to animal welfare** and the conduct of our business, including … **U.S. USDA Animal Welfare Regulations**. **Our facilities are therefore subject to routine formal inspections by regulatory and supervisory authorities, including the U.S. FDA, the U.S. USDA** and the U.K. Home Office**, as well as by representatives from customer companies.**

**Envigo expends significant resources on compliance efforts.** Regulations and guidance worldwide concerning the production and use of laboratory animals for research purposes continue to be updated. … Similarly, guidance has been and continues to be developed for other areas that impact the biomedical research community on both a national and international basis, including transportation, import and export requirements of biological materials, and animal housing and welfare. Certain of our customers may require us to comply with any new guidance in advance of our implementation as a condition to being awarded contracts. **Conforming to new guidelines may result in increased costs attributable to**

***adding or upgrading facilities, the addition of personnel to address new processes
and increased administrative burden.***

(Emphasis added.)

92.     The Proxy Statement was materially false and misleading because it failed to:

address the horrific conditions at Envigo's facilities, despite the statement that several Defendants

conducted site visits; and adequately disclose the legal, reputational, and operational risks that

Envigo's facilities would have on Inotiv's business. Accordingly, the Individual Defendants used

the Proxy Statement to improperly solicit shareholder approval on the conditions needed

ratification for the Merger to be complete, without giving shareholders all necessary information.

***November 5, 2021 Press Release***

93.     On November 5, 2021, Inotiv issued a press release entitled "Inotiv, Inc.

Completes Purchase of Envigo" which stated the following, in pertinent part, regarding Envigo

and touting its growth opportunities, and its animal services and abilities:

> "The combination of Inotiv and Envigo allows drug developers to work with one
> organization for the entirety of discovery and nonclinical development, while
> getting the same highly personalized service that characterizes both companies.
> ***The combined company has excellent growth opportunities, and we plan to
> continue to make investments for organic growth while selectively pursuing
> strategic acquisitions***," said Inotiv President and CEO Robert Leasure, Jr. "***Envigo
> has a long history and deep experience with supply of critical research models,
> which will be integrated with Inotiv's range of nonclinical and analytical
> services***. This provides clients with a unique, full-spectrum discovery-to-approval
> solution to meet the increasing growth and innovation in biopharma and demand
> for specialty and disease-specific models."
>
> With Inotiv and Envigo combined, drug developers and researchers will receive:
> •      Deep expertise and expanded access to scientists across the discovery and
> preclinical continuum, reducing nonclinical lead times and providing enhanced
> project delivery
> •      Access to a wide range of high-quality small and large research models for
> basic research and drug discovery and development, as well as models for
> specialized disease and therapeutic areas
> •      The ability to run selected nonclinical studies directly on-site at closely
> located research model facilities and access to innovative genetically engineered

models and services (GEMS) solutions

(Emphasis added.)

94.     The November 5, 2021 Press Release was materially false and misleading as the Individual Defendants wrongly touted Envigo's business and the opportunity it provided Inotiv for growth. In reality, however, Envigo was under government security and was a liability for Inotiv.

*Annual 2021 Report*

95.     On December 21, 2021, the Company filed with the SEC its annual report for the year ended September 30, 2021 on Form 10-K (the "2021 Annual Report") signed by Defendants Leasure, Taylor, Johnson, Davis, Sagartz, Neff, Brown, and Cragg.

96.     The 2021 Annual Report stated the following, in pertinent part, regarding Envigo and touting its animal services and abilities:

<u>Envigo's Competitive Strengths</u>

We believe that Envigo is well positioned to capitalize on favorable trends in the research industry and provide differentiated solutions to our customers based on the key competitive strengths set forth below:
…
*Commitment to animal welfare.* **Envigo is on the forefront of humane care of laboratory animals** and implementation of the "3Rs" (Replacement, Reduction and Refinement). **Envigo maintains high standards of animal welfare** as evidenced by its strong compliance record with regulators across the globe. Envigo frequently advises our customers in matters relating to animal welfare, including enrichment, housing and animal husbandry.

\*          \*          \*

<u>Industry Support and Animal Welfare</u>

Envigo is committed to delivering first-class health and genetic quality, operational performance and customer service. **High standards of animal welfare are vital to each of these, and so are integral to Envigo's business success.**

**Envigo has been at the forefront of animal welfare improvements and the humane care of laboratory animals.** Envigo is a leading advocate for implementation of the 3Rs (Replacement, Reduction and Refinement). **Members**

28

*of Envigo's scientific and technical care staff undertake continuing professional development in the field of laboratory animal science, with special focus to animal welfare* and the 3Rs, and they are encouraged to publish and present within the scientific community.

Envigo has formed an internal Institutional Animal Care and Use Committee, comprising staff from many disciplines within Envigo, in addition to external representation, *to comply with applicable regulations and provide strict oversight of animal welfare matters*. Envigo's animal production facilities in the U.S. and the Netherlands, are accredited by the Association for Assessment and Accreditation of Laboratory Animal Care International ("AAALAC"), a private, non-profit, international accrediting organization that promotes the humane treatment of animals in science through voluntary accreditation and assessment programs. *Envigo's facilities are routinely inspected by government agencies tasked with enforcing animal welfare regulations.* …

Laboratory animals remain an essential component in the research and development that our customers conduct. They further our knowledge of living systems and help in the discovery and development of products that can save or enhance people's lives. *Envigo works with the scientific community to improve our understanding and promote best practice in the care and welfare of research animals.* As providers of research models to the research community, *Envigo is responsible to our customers and the public for the health and well-being of the animals in our care*.

<u>Environmental, Social and Governance Principles</u>

Envigo endeavors to fully comply with all applicable environmental, social and governance criteria. Envigo's strengths include, among other areas, its dedicated responsibility for environmental issues; its waste management and hazardous substances handling procedures; labor and human rights policies (including employee health and safety); customer protection policies and efforts; and policies on anticorruption and bribery.

*Animal Welfare*. Envigo maintain policies regarding animal welfare. *Given Envigo's line of business, animal welfare is one of its highest priorities, as it is crucially important from both an ethical and a good business practices perspective.*

\*        \*        \*

*Regulatory Matters*

… The Animal Welfare Act ("AWA") governs the care and use of certain species of animals used for research in the U.S. other than laboratory rats, mice and birds. *For regulated species, the AWA and the associated animal care regulations*

29

*require producers and users of regulated species to provide veterinary care and to utilize specific husbandry practices such as cage size, shipping conditions, sanitation and environmental enrichment to assure the welfare of these animals.* Separately, facilities using live vertebrate animals in research funded by the U.S. Public Health Service ("PHS") must also adhere to the PHS Policy on Humane Care and Use of Laboratory Animals and follow the Guide for the Care and Use of Laboratory Animals produced by the Institute for Laboratory Animal Research.

Envigo is subject to licensing and registration requirement standards set by the United States Department of Agriculture ("USDA") and similar agencies in other countries for the care and use of regulated species. … *Envigo is regularly consulted and inspected by the relevant national authorities in order to ensure continued compliance with the legal requirements in each nation in which it operates.*

Envigo's import and export of animals and its operations in foreign countries are subject to international agreements and conventions, as well as a variety of national, regional, and local laws and regulations, which establish the standards for the humane treatment, care, handling and transport of animals by dealers and research facilities.

(Emphasis added.)

97.     The 2021 Annual Report was false and misleading as it touted Envigo's supposed focus on animal welfare while merely noting that an Envigo facility was appealing certain non-compliance findings, without discussing the ongoing violations, stating the following, in pertinent part:

**We are subject to periodic inspections by regulatory authorities which could lead to enforcement actions if those authorities determine that our facilities or procedures do not meet applicable requirements.**

*We are subject to periodic inspections by regulatory authorities, including the FDA and the USDA.* As part of these inspections, the regulatory authorities seek to determine whether our facilities and operations comply with applicable laws and regulations.  Adverse findings as a result of these inspections could lead to enforcement actions,  including substantial fines, warning letters that require corrective action (including potential facilities improvement requirements), revocation of approvals, exclusion from future participation in government healthcare programs, criminal prosecution and even the denial of the right to conduct business. During the period from July through December 2021, one of the Envigo's U.S. facilities was inspected on several occasions by the USDA. Following the inspection, USDA issued inspection reports with findings of non-compliance with certain USDA laws and regulations.  Envigo formally appealed

certain of the findings and the USDA has indicated it intends to conduct a formal investigation. The inspections and/or the investigation could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation. The imposition of any of these penalties or other restrictions on our business as a result of the inspections could adversely affect our business reputation and could have a material adverse impact on our financial condition, results of operations and stock price.

### First Quarter 2022 Report

98.     On May 16, 2022, the Company filed with the SEC its periodic report for the quarter ended March 31, 2022 (the "1Q22 Report") signed by Defendant Leasure. The 1Q22 Report stated the following, in pertinent part, regarding the investigation into an Envigo facility without noting that the facility would be shut down within a month nor the ongoing issues:

*Government Investigations*

During the period from July 2021 through March 2022, one of Envigo's U.S. facilities was inspected on several occasions by the U.S. Department of Agriculture ("USDA"). USDA issued inspection reports with findings of non-compliance with certain USDA laws and regulations. ***Envigo formally appealed certain of the findings, and has made multiple remediations and improvements at the facility, of which it has kept USDA apprised.*** USDA has indicated it intends to conduct a formal investigation. The inspections and/or the investigation could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation. As of the 10-Q filing date, no investigation had been initiated.

(Emphasis added.)

99.     The 1Q22 Report was false and misleading as it failed to elaborate and provide detail on the horrific conditions at Envigo's facilities as well as the violations of state and federal laws which would lead to legal action taken by the government within days.

### *The Truth Begins To Emerge*

100.    On May 20, 2022, Inotiv's prior statements that there was no meaningful cause for alarm regarding Envigo's facilities started to unravel. After market hours, the Company filed a

31

current report on Form 8-K with the SEC that announced: (i) a government search and seizure at the Cumberland Facility; and (ii) the filing of *Envigo* Action which asserted violations of the AWA. The May 20, 2022 Form 8-K stated in relevant part:

> As previously disclosed, beginning in July 2021, a facility of Envigo RMS, LLC ("Envigo"), a subsidiary of Inotiv, Inc. (the "Company"), in Cumberland, Virginia was inspected on several occasions by the U.S. Department of Agriculture.
>
> ***On May 18, 2022, the U.S. Department of Justice ("DOJ"), together with federal and state law enforcement agents, executed a search and seizure warrant on the Cumberland, Virginia facility.*** The warrant was issued by the U.S. District Court for the Western District of Virginia on May 13, 2022. Consistent with Company policy, the Company is cooperating with DOJ and other involved authorities.
>
> ***On May 19, 2022, a complaint was filed against Envigo in the U.S. District Court for the Western District of Virginia. The complaint is a civil action by DOJ alleging violations of the Animal Welfare Act at the Cumberland, Virginia facility.*** The complaint seeks declaratory and injunctive relief and costs. The Company is in the process of reviewing the matters set forth in the complaint and at this time cannot reasonably estimate the associated costs.

(Emphasis added.)

101.    On Saturday, May 21, 2022, Judge Moon of the United States District Court for the Western District of Virginia issued an amended temporary restraining order (issued *ex parte*). In his order, Judge Moon held that there was enough evidence to demonstrate that Envigo had been engaging in serious violations of federal law. Judge Moon's order stated the following, including specific conditions at Envigo's facility, in relevant part:

> On May 19, 2022, the United States of America filed a complaint and motion requesting an *ex parte* temporary restraining order directed against Envigo, a company that breeds and sells animals for use in scientific research. ***Envigo's facility in Cumberland, Virginia, raises thousands of beagles for these purposes at any given time. This Court now concludes that the Government has provided sufficient evidence that Envigo is engaged in serious and ongoing violations of the Animal Welfare Act, and that an immediate temporary restraining order must issue to put a halt to such violations pending further proceedings.***
>
> ***Over 300 beagle puppies have died onsite due to "unknown causes" over seven months. Many were not given anesthesia before they were euthanized by***

*intracardiac injection.* Beagles with even minor injuries or easily treated medical conditions were euthanized rather than given veterinary care. ***Nursing female beagles were denied food, and so they (and their litters) were unable to get adequate nutrition.*** The food that the beagles did receive was observed to contain live insects, worms, maggots, beetles, flies, ants, mold, and feces.

Beagle puppies remained housed in their enclosures as they were hosed down with cold water, leaving them shivering. ***Over an eight-week period, 25 beagle puppies died from cold exposure.*** The enclosures were overcrowded. The facility was understaffed. Inspectors found over 900 beagle and beagle puppy records to be incomplete or inaccurate. The list of serious violations of the Animal Welfare Act and its regulations goes on and on. Indeed, ***pursuant to federal search warrant executed days ago (May 18, 2022), law enforcement has seized 145 dogs and puppies from the facility that veterinarians determined needed immediate care to alleviate life-threatening illnesses or injuries.***

The Government has demonstrated that extraordinary relief in the form of an *ex parte* temporary restraining order is warranted to put an immediate halt to such practices. Defendants will have the opportunity to plead their case on an expedited basis.

*          *          *

***The Government contends that Envigo has consistently failed, despite repeated warnings and opportunities for correction, to meet its obligations under AWA's implementing regulations to provide adequate veterinary care.*** *See* Dkt. 2-1 pp. 10–11. ***Based on the overwhelming evidence produced by the Government, the Court agrees.***

*          *          *

***Envigo's level of veterinary care for its beagles has not improved since those earlier inspections.*** Veterinary exams ensuing from the May 18, 2022, search warrant determined that 145 beagles were in "acute distress," meaning that the beagles required "immediate veterinary treatment or other care to promptly alleviate a life-threatening illness/injury or any suffering." Moffitt Decl. ¶ 8. The Court understands this number is likely to grow as the Government's veterinarians continue to examine dogs throughout the weekend. Dkt. 2-1 p. 6. ***Even those beagles not currently in "acute distress" are suffering from significant and serious health conditions, including wounds that required wound care and antibiotics or anti-inflammatory medications, or swollen or enflamed paws, or had dental disease, or other health issues.***

*          *          *

… Despite these harrowing statistics, Envigo's attending veterinarian apparently does not require Envigo staff to notify her when a puppy is found dead. Compl. ¶ 72; Dkt. 2-3 p.1. ***The Government maintains, and the Court agrees, that such a policy is inconsistent with Envigo's obligation to utilize methods appropriate to the prevention of disease and injury.*** *See* Compl. ¶ 72. Those medical records which are present (even if incomplete) and other evidence submitted further demonstrate that Envigo was failing to attend to beagles' wellbeing or provide them adequate veterinary care with respect to any injuries, illnesses, or serious health conditions which caused the deaths of these particular beagles and beagle puppies and further suggest Envigo's failure to make efforts to learn from these (hundreds) of premature deaths to ensure other litters' health and safety.

\* \* \*

… ***Perhaps the most heinous discovery of the November 2021 inspection was that Envigo had allowed staff to euthanize dogs without anesthesia, in violation of the facility's own program of care.*** *Id.* ¶ 62; Dkt. 2-5 p. 1 ("Inspectors reviewed 171 medical records documenting euthanasia of 196 dogs and puppies and found that many young puppies are not receiving anesthesia prior to being euthanized via intracardiac injection as required by the SOP.").

\* \* \*

The Government's evidence also displays a disturbing failure by Envigo to meet its obligation to provide each beagle with clean, palatable food of adequate quantity and nutritive value. *See* Dkt. 2-1 pp. 11–12.

…***The July 2021 inspectors discovered that nursing females were being denied food for 42-hour periods—apparently in an effort to reduce milk production.*** Dkt. 2-2 p. 6. ***In lieu of the daily feeding required by § 3.9(a), food receptacles were placed in front of the mothers' enclosures, so that they could see and smell the food but not eat it.*** *Id.* 7. *See also id.* ("Three dams were observed to be reaching their front paws through the doors of the cages to reach the food in the top of their feeders, these dogs were seen trying to scoop or dig out food from the feeders but could only retrieve the occasional piece of kibble."). ***The reduced milk production resulting from this practice almost certainly meant that nursing puppies were not having their nutritional needs met either.*** *See* Compl. ¶¶ 80–81.

\* \* \*

As described above, the Court finds the Government has clearly demonstrated that irreparable harm will result absent injunctive relief. ***Specifically, Envigo has been operating and continues to operate in a manner that flagrantly disregards numerous health protocols, placing the health of animals in serious danger and risk of death.*** See 7 U.S.C. § 2146(c). USDA inspection records documented dozens of instances in which dogs were euthanized rather than provided medical

care when they had an injury, no matter how substantial or minor. *E.g.*, Dkt. 2-3 p. 6; Hollingsworth Decl. ¶ 5.

(Emphasis added.) (Internal footnotes omitted.)

102.    As opposed to the statements that the Individual Defendants caused Inotiv to disseminate, making it appear that Envigo was in good standing, the *Envigo* Action and Judge Moon's review of the evidence the government proffered demonstrated the degree of illegality and inhumane treatment of thousands of beagles at the Cumberland Facility.

103.    On this news, the Company's share price fell $5.19 per share, or 28%, to close at $13.14 per share on May 23, 2022, the next trading day.

104.    On June 1, 2022, Judge Moon granted a joint request to extend the temporary restraining order and continued the preliminary injunction hearing that was scheduled for the next day. *Envigo*, Dkt. No. 13 at 1-2.

105.    On this news, the Company's share price fell 3.5% to close at $14.76 per share on June 1, 2022.

106.    On June 13, 2022, after trading hours, Inotiv issued a press release entitled "Inotiv, Inc. Announces Site Closures and Consolidation Plans" which stated the following regarding Inotiv closing two Envigo facilities mere months after the Merger:

Inotiv, Inc. (NASDAQ: NOTV) (the "Company", "We", "Our" or "Inotiv"), a leading contract research organization specializing in nonclinical and analytical drug discovery and development services and research models and related products and services, ***announces the closure of two Envigo RMS ("Envigo") facilities in Virginia: a purpose-bred canine facility in Cumberland*** and a rodent breeding facility in Dublin as part of restructuring activities following its acquisition of Envigo RMS LLC in November 2021.

Robert Leasure, Jr., Inotiv's President and Chief Executive Officer commented, "***Since the Envigo acquisition in November 2021, the Cumberland, Virginia, facility was recognized as needing improvements and investments. Inotiv has been pleased with the continued and significant progress in improvements at the Cumberland facility since the acquisition, as evidenced by recent inspections by***

*the USDA and other auditing organizations.* We sincerely appreciate our customers', employees', and third-party input to date in support of this facility. The required investments to improve the facility and the lead time to achieve these improvements have recently increased. As a result, we have decided we will not be investing further in this facility, and it will be closed. We will implement an orderly closure plan. Cumberland comprises less than 1% of our total Inotiv revenue and has not contributed to profits in our Research Models and Services segment since the acquisition."

(Emphasis added.)

107.    On this news, the Company's share price fell 2% to close at $12.78 per share on June 14, 2022.

108.    On June 17, 2022, Judge Moon granted in part[4] the Government's preliminary injunction request noting that: "[o]verwhelming evidence of Defendant's AWA violations, and of the irreparable harm that would result without intervention by the Court, was detailed in the Court's order date May 21, 2022. S*ee* Dkt. 6 pp. 5–19. But the Government has since supplemented its evidence with affidavits showing that Defendant remains in violation of the AWA as of June 8. *See e.g.*, Dkt. 17-4 ¶ 32[.]"

109.    On this news, the Company's share price fell 1.9% to close at $11.80 per share on June 17, 2022.

## DAMAGES TO INOTIV

110.    As a direct and proximate result of the Individual Defendants' conduct, Inotiv has expended and will continue to expend significant sums of money.

---

[4] Judge Moon denied in part the Government's injunction request to the extent that it prevented Inotiv from fulfilling its existing contracts due in large part to its constraints as the Court was "limited to balancing the concrete burdens on both parties[,]" and there being no burden on the Government with Inotiv fulfilling its contracts, equitable concerns, public interest in research animals use, and that punitive damages of $10,000 per violation pursuant to 7 U.S.C. § 2149(b) were available later. *Envigo*, Dkt. No. 21 at 5-6.

111.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action filed against the Company for violations of the federal securities laws and the *Envigo* Action filed by the U.S. Department of Justice including previous investigations by federal and state law enforcement agents, and enforcement actions. Inotiv will incur additional expenditures and economic harm due to facility closures, business losses associated with the Company's Merger, and amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

112.    As a direct and proximate result of the Individual Defendants' conduct, Inotiv has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

113.    Plaintiff brings this action derivatively and for the benefit of Inotiv to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Inotiv, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act.

114.    Inotiv is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

115.    Plaintiff is, and at relevant times has been, an Inotiv shareholder. Plaintiff will adequately and fairly represent the interests of Inotiv in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

116.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

117.    A pre-suit demand on the Board of Inotiv is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Leasure, Davis, Neff, Johnson, Sagartz, Brown, and Cragg (collectively, the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the seven Director-Defendants that are on the Board at the time this action is commenced.

118.    Defendant Leasure is Inotiv's CEO and a Director and has been since prior to the Relevant Period. Defendant Leasure received, and continues to receive, handsome compensation for his positions as a director and officer of Inotiv. Defendant Leasure is responsible for the false and misleading statements and omissions made during the Relevant Period, including those in the 2021 Annual Report, the 1Q22 Report, and the Proxy Statement. Defendant Leasure signed each of these documents. The Proxy Statement, that contained a letter from Defendants Leasure to Inotiv shareholders, was used to solicit votes to approve the necessary measures that needed shareholder ratification prior to the Merger. Defendant Leasure was also heavily involved in the day-to-day discussions, due diligence, and overall assessment of the Merger with Envigo, even traveling to Envigo's facilities including in Virginia. In complete abdication of his fiduciary duties, Defendant Leasure participated in the scheme to hide the conditions at Envigo. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. As a result, Defendant

Leasure breached his fiduciary duties. Additionally, Defendant Leasure is a defendant in the Securities Class Action. For these reasons, Defendant Leasure faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

119.    Defendant Davis, as the Chair of the Board, was responsible for the Company's operations, internal controls, and false and misleading statements and omissions during the Relevant Period. He has been a director since before the Relevant Period. Defendant Davis received, and will continue to receive, handsome compensation for serving on Inotiv's Board, sitting on the Audit Committee, Compensation Committee, and Nominating and Corporate Governance Committee. Defendant Davis is responsible for the false and misleading statements and omissions made during the Relevant Period, including in the 2021 Annual Report (which he signed), the 1Q22 Report, and Proxy Statement, that was used to solicit votes to approve the necessary measures that needed shareholder ratification prior to the Merger. Defendant Davis was on the Board during the discussions and deliberations of the Merger and thus, participated and approved of the Merger. Defendant Davis conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Davis either participated in or was recklessly unaware of the scheme to hide the conditions at Envigo. As a result, Defendant Davis breached his fiduciary duties. For these reasons, Defendant Davis faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

120.    Defendants Neff is a director of Inotiv and has been since before the Relevant Period. Defendant Neff received, and will continue to receive, handsome compensation for

serving on Inotiv's Board as Chair of the Audit Committee and a member of the Compensation Committee. Defendant Neff is responsible for the false and misleading statements and omissions made during the Relevant Period, including in the 2021 Annual Report (which he signed), 1Q22 Report, and Proxy Statement, that was used to solicit votes to approve the necessary measures that needed shareholder ratification prior to the Merger. Defendant Neff was on the Board during the discussions and deliberations of the Merger and thus, participated and approved of the Merger. Defendant Neff conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Neff either participated in or was recklessly unaware of the scheme to hide the conditions at Envigo. As a result, Defendant Neff breached his fiduciary duties. For these reasons, Defendant Neff faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

121.    Defendants Johnson is a director of Inotiv and has been since before the Relevant Period. Defendant Johnson received, and will continue to receive, handsome compensation for serving on Inotiv's Board, serving as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee and Compensation Committee. Defendant Johnson is responsible for the false and misleading statements and omissions made during the Relevant Period, including in the 2021 Annual Report (which he signed), 1Q22 Report, and Proxy Statement, that was used to solicit votes to approve the necessary measures that needed shareholder ratification prior to the Merger. Defendant Johnson was on the Board during the discussions and deliberations of the Merger and thus, participated and approved of the Merger. Defendant Johnson conducted little, if any, oversight of the Company's engagement in the scheme

to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Johnson either participated in or was recklessly unaware of the scheme to hide the conditions at Envigo. As a result, Defendant Johnson breached his fiduciary duties. For these reasons, Defendant Johnson faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

122. Defendant Sagartz has been director of Inotiv since before the Relevant Period and is an Inotiv employee serving as Chief Strategy Officer. Defendant Sagartz as both an employee and director of Inotiv received, and will continue to receive, handsome compensation. Defendant Sagartz is responsible for the false and misleading statements and omissions made during the Relevant Period, including in the 2021 Annual Report (which he signed), 1Q22 Report, and Proxy Statement, that was used to solicit votes to approve the necessary measures that needed shareholder ratification prior to the Merger. Defendant Sagartz was on the Board during the discussions and deliberations of the Merger and thus, participated and approved of the Merger. Defendant Sagartz was heavily involved in the day-to-day discussions, due diligence, and overall assessment of the Merger with Envigo, even traveling to Envigo's facilities including in Virginia. Defendant Sagartz conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Sagartz either participated in or was recklessly unaware of the scheme to hide the conditions at Envigo. As a result, Defendant Sagartz breached his fiduciary duties. For these reasons, Defendant Sagartz faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

123.    Defendant Brown joined the Board as part of the Merger. Defendant Brown received, and will continue to receive, handsome compensation for serving on Inotiv's Board as a member of the Audit Committee and Nominating and Corporate Governance Committee. As a director beginning in November 2021, Defendant Brown is responsible for the false and misleading statements and omissions made during the Relevant Period, including in the 2021 Annual Report, which he signed, and the 1Q22 Report. Prior to serving on Inotiv's Board, Defendant Brown was at Envigo and knew, or should have known, the true conditions of Envigo's facilities and business. Defendant Brown conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Brown either participated in or was recklessly unaware of the scheme to hide the conditions at Envigo. As a result, Defendant Brown breached his fiduciary duties. For these reasons, Defendant Brown faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

124.    Defendant Cragg joined the Board as part of the Merger. Defendant Cragg received, and will continue to receive, handsome compensation for serving on Inotiv's Board, acting as Chair of the Compensation Committee. As a director beginning in November 2021, Defendant Cragg is responsible for false and misleading statements and omissions made during the Relevant Period, including in the 2021 Annual Report, which he signed, and the 1Q22 Report. Prior to serving on Inotiv's Board, Defendant Cragg was at Envigo and was heavily involved in the day-to-day discussions about the Merger with individuals Inotiv such as Defendants Leasure and Sagartz. Thus, Defendant Cragg knew, or should have known, the true conditions of Envigo's

facilities and business. Defendant Cragg conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In complete abdication of his fiduciary duties, Defendant Cragg either participated in or was recklessly unaware of the scheme to hide the conditions at Envigo. As a result, Defendant Cragg breached his fiduciary duties. For these reasons, Defendant Cragg faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

125.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the aforementioned conduct, which renders them unable to impartially investigate the conduct and decide whether to pursue action against themselves and the other perpetrators of the conduct.

126.    In complete abdication of their fiduciary duties, all of the Director-Defendants either participated in or were recklessly unaware of the conduct to make the Company appear more attractive to investors, and to increase the Company stock price. As a result, the Director-Defendants breached their fiduciary duties. Thus, the Director-Defendants face a substantial likelihood of liability, and demand upon them is futile.

127.    The Director-Defendants, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics required the Director-Defendants to adhere to Inotiv's standards of business conduct. The Director-Defendants did not comply with the requirements of the Code of Ethics. The Director-Defendants violated the Code of Ethics by causing the Merger and by the Cumberland Facility's failure to follow the law or protect animal welfare and to make false and misleading statements of material fact. Because the Director-Defendants violated the

Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

128.     Furthermore, demand in this case is excused because the Director-Defendants, who are named as defendants in this action and who may be the subject of investigations of federal and state law enforcement agents or others, control the Company and are beholden to each other.

129.     Members of the Board have (often longstanding) business and personal relationships with each other that precludes them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Board from adequately monitoring the Company's operations and potential combinations and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

130.     Inotiv has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Inotiv any part of the damages Inotiv suffered and will continue to suffer thereby. Thus, any demand on the Director-Defendants would be futile.

131.     The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As the Director-Defendants face a substantial likelihood of liability, they are self-interested in the actions and inactions challenged herein and cannot be presumed to be

capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

132.    The acts complained of herein constitute violations of fiduciary duties owed by Inotiv's officers and directors and these acts are incapable of ratification.

133.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Inotiv. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, among other things, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Inotiv, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

134.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Inotiv to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

135.    Thus, for the reasons set forth above, all of the Director-Defendants, and, if not all of them, certainly a majority of the Director-Defendants, cannot consider a demand with

disinterestedness and independence. Consequently, a demand upon the Director-Defendants is excused as futile.

136.    Overall, the Company has and will most likely expend substantial resources on internal investigations and defending the Securities Class Action, the *Envigo* Action, and any other related actions. The Company will also lose substantial sums of money due, among other things, the closure of two newly purchased facilities, including the Cumberland Facility, and related legal and regulatory costs. Moreover, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers. Inotiv's prospect of raising equity in the future is weakened. All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, waste of corporate assets, violations of Section 14(a) of the Exchange Act, and other malfeasance.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

137.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

138.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Inotiv's business and affairs.

139.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

140.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein.

The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Inotiv.

141.    In breach of their fiduciary duties owed to Inotiv, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements, and failed to properly oversee Inotiv's business, rendering them personally liable to the Company for breaching their fiduciary duties.

142.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations, potential combination, and prospects and they failed to correct the Company's public statements. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Inotiv's securities.

143.    The Individual Defendants had actual or constructive knowledge that that they had caused the Company to make material misrepresentations and omissions and to fail to maintain adequate internal controls. Defendants had actual knowledge that the Merger, particularly with regards to the Cumberland Facility and later the Company's ownership and control of the Cumberland Facility, raised significant legal and regulatory issues as well as reputational risks with its illegal care of beagles. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Inotiv's securities.

144.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Inotiv has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against Individual Defendants for Abuse of Control

146.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Inotiv, for which they are legally responsible.

148.     As a direct and proximate result of the Individual Defendants' abuse of control, Inotiv has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Inotiv has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CLAIM

### Against Individual Defendants for Gross Mismanagement

149.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Inotiv in a manner consistent with the operations of a publicly-held corporation.

151.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Inotiv has sustained and will continue to sustain significant damages.

152.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

153.    Plaintiff, on behalf of Inotiv, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

154.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

156.    In addition, the Individual Defendants caused the Company to enter into the Merger by paying holders of outstanding capital stock in Envigo cash consideration of $271 million, including adjustments for net working capital and cash balances as provided in the merger agreement of approximately $13.0 million and $48.0 million, as well as 9,036,538 Inotiv common shares. The Individual Defendants caused Inotiv to overpay for the purchase of Envigo given the serious concerns of Envigo's operations and the closure of several of its facilities.

157.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

158.    Plaintiff, on behalf of Inotiv, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

159.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

160.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

161.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his or her name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

163.     Under the direction and watch of the Individual Defendant, the Proxy Statement failed to disclose, among other things, that: (1) Envigo was violating federal and state laws and regulations, including the AWA, which were so troubling that would lead to closures of its facilities; (2) the ongoing wrongdoing at Envigo's facilities would harm Inotiv and its reputation; (3) the Board did not engage in proper due diligence when it evaluated the merger with Envigo; and (4) the Board improperly solicited approval from Inotiv shareholders of conditions needed to be met prior to the Merger.

164.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

165.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including, ratification of the conditions to lead to the consummation of the Merger.

166.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

167.     Plaintiff on behalf of Inotiv has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     declaring that Plaintiff may maintain this action on behalf of Inotiv, and that Plaintiff is an adequate representative of the Company;

(b)     declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Inotiv;

(c)     determining and awarding to Inotiv the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     directing Inotiv and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inotiv and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Inotiv to nominate at least four candidates for election to the Board;

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

4.     a proposal to ensure the safety and proper care of all animals under Inotiv and its subsidiaries; and

5.     a proposal to increase the diversity of the Board, including diversity of gender and professional background to focus on animal welfare.

(e)     awarding Inotiv restitution from Individual Defendants, and each of them;

52

(f)     awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: September 9, 2022                    */s/ Brad A. Catlin*
                                            Brad A. Catlin, Atty. No. 21570-29
                                            **WILLIAMS & PIATT, LLC**
                                            1101 North Delaware Street
                                            Indianapolis, IN 46202
                                            317.633.5270
                                            F: 317.426.3348
                                            brad@williamspiatt.com

                                            *Liaison Counsel for Plaintiff*

                                            **THE ROSEN LAW FIRM, P.A.**
                                            Phillip Kim, Esq.
                                            275 Madison Avenue, 40th Floor
                                            New York, NY 10016
                                            Telephone: (212) 686-1060
                                            Fax: (212) 202-3827
                                            Email: pkim@rosenlegal.com

                                            *Counsel for Plaintiff*

## VERIFICATION

I, Sergio Grobler am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of September 2022.

Sergio Grobler