## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| IN RE INOTIV STOCKHOLDER DERIVATIVE LITIGATION | Case No. 4:22-cv-64-PPS-AZ |

## VERIFIED CONSOLIDATED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Sergio Grobler and William Noble Burkhart (together, "Plaintiffs"), by and through their undersigned attorneys, bring this derivative complaint for the benefit of nominal defendant, Inotiv, Inc. ("Inotiv" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and contribution for violations of Sections 10(b) and 21D of the Exchange Act. Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Inotiv with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.      Inotiv, together with its subsidiaries, operates as a contract research organization specializing in nonclinical and analytical drug delivery and development services. On November 5, 2021, Inotiv acquired Envigo RMS Holding Corp. ("Envigo") for $271 million. As a result, the Company's operations now include breeding, importing and selling research-quality animal models for use in laboratory tests, manufacturing and distributing standard and custom diets, distributing bedding and enrichment products, and providing other services associated with these

products. Envigo has facilities throughout the country, including one in Cumberland, Virginia (the "Cumberland Facility").

2.      Inotiv's acquisition of Envigo was purportedly supported by extensive due diligence, including site visits. Unbeknownst to stockholders, while this due diligence was conducted, the U.S. Department of Agriculture ("USDA") found numerous violations of the Animal Welfare Act ("AWA") at the Cumberland Facility and issued directives to Envigo to remediate them.

3.      On May 20, 2022, after the market closed, Inotiv disclosed that the U.S. Department of Justice ("DOJ") filed a complaint against Envigo alleging violations of the AWA, after the DOJ had executed a search and seizure warrant at the Cumberland Facility. On May 21, 2022, Judge Norman K. Moon of the United States District Court for the Western District of Virginia issued an amended temporary restraining order. Citing the "overwhelming evidence" provided by the DOJ, Judge Moon found that "Envigo has consistently failed, despite repeated warnings and opportunities for correction, to meet its obligations under AWA's implementing regulations to provide adequate veterinary care." On this news, the Company's share price fell $5.19, or 28%, to close at $13.14 per share on May 23, 2022.

4.      On June 13, 2022, Inotiv announced that it was closing two Envigo facilities, mere months after the acquisition, due to the significant investments required to improve the facility.

5.      These revelations precipitated the filing of a securities class action in this District against Inotiv and certain of the defendants named herein, captioned *In re Inotiv, Inc. Securities Litigation*, Case No. 4:22-cv-00045 (the "Securities Class Action"). On March 29, 2024, U.S. District Judge Philip P. Simon denied defendants' motion to dismiss the Securities Class Action, sustaining claims based on Sections 10(b), 20(a), and 14(a) of the Exchange Act against Inotiv and

certain of its executive officers. As a result, it is now a virtual certainty that the Company will incur significant liability regarding the claims brought in the Securities Class Action.

6.      Recently, it became publicly known that Inotiv would be paying significant penalties to resolve the DOJ complaint based on the wrongdoing stated herein. In May 2024, Inotiv announced that it had reached an agreement-in-principle to resolve claims by the DOJ regarding the Cumberland Facility and accrued a $26.5 million liability. On this news, the Company's stock price fell nearly 50%.

7.      On June 3, 2024, the DOJ announced that Inotiv will pay $35 million, including an $11 million fine for AWA violations, to resolve its investigation into the Cumberland Facility.

8.      Plaintiffs did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II.    JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act and contribution for violations of Section 10(b) and 21D of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

### III.    PARTIES

**Plaintiff**

11.    Plaintiff Sergio Grobler is and was at all relevant times a shareholder of Inotiv.

12.    Plaintiff William Noble Burkhart is and was at all relevant times a shareholder of Inotiv.

**Nominal Defendant**

13.    Nominal Defendant Inotiv is an Indiana corporation with its principal executive offices located at 2701 Kent Avenue, West Lafayette, Indiana 47906.  The Company's common stock trades on the NASDAQ under the symbol "NOTV."

**Defendants**

14.    Defendant Robert W. Leasure, Jr. ("Leasure") has served as Chief Executive Officer ("CEO") and as a director of the Company since January 2019. He is named as a defendant in the Securities Class Action.

15.    Defendant Beth A. Taylor ("Taylor") has served as the Company's Chief Financial Officer ("CFO") since March 2020. She is named as a defendant in the Securities Class Action.

16.    Defendant Carmen Wilbourn ("Wilbourn") is the Company's Vice President of Operations, North America. She joined Envigo in May 2021 and oversaw 11 of its facilities, including the Cumberland Facility. In January 2022, her responsibilities shifted to Inotiv's canine and rabbit facilities in North America. Since June 2022, if not earlier, Defendant Wilbourn worked primarily out of the Cumberland Facility.

17.    Defendant Gregory C. Davis ("Davis") served as a director of the Company from June 2017 to March 2024.

18.    Defendant Richard A. Johnson ("Johnson") served as a director of the Company from May 2012 until October 2023.

19.    Defendant John E. Sagartz ("Sagartz") has served as a director of the Company since July 2018.

20.    Defendant R. Matthew Neff ("Neff") has served as a director of the Company since August 2017.

21.    Defendant Nigel Brown ("Brown") has served as a director of the Company since November 2021.

22.    Defendant Scott Cragg ("Cragg") served as a director of the Company from November 2021 until January 2023. Cragg was previously a director of Envigo.

23.    Defendants Leasure, Taylor, Wilbourn, Davis, Johnson, Sagartz, Neff, Brown, and Cragg are sometimes referred to hereinafter as the "Individual Defendants."

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

24.    By reason of their positions as officers, directors, and/or fiduciaries of Inotiv and because of their ability to control the business and corporate affairs of Inotiv, at all relevant times, the Individual Defendants owed Inotiv and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Inotiv in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Inotiv and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Inotiv and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

25.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inotiv, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial,

and directorial positions with Inotiv, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

26.     To discharge their duties, the officers and directors of Inotiv were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Inotiv were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Background

27.     Inotiv, together with its subsidiaries, operates as a contract research organization specializing in nonclinical and analytical drug delivery and development services. The Company maintains facilities in the United States, United Kingdom, Europe, and Israel. Inotiv also manufactures scientific instruments for life sciences research that are sold to pharmaceutical companies, universities, government research centers, and medical research institutions.

28.     On November 5, 2021, Inotiv acquired Envigo. As a result, Inotiv's operations expanded to include breeding, importing and selling research-quality animal models for use in

laboratory tests, manufacturing and distributing standard and custom diets, distributing bedding and enrichment products, and providing other services associated with these products. Envigo has facilities throughout the country, including the Cumberland Facility.

29.     Envigo is subject to state and federal rules and regulations concerning the treatment of animals. Specifically, Envigo must comply with the AWA, which "requires that minimum standards of care and treatment be provided for certain animals bred for commercial sale; used in research, teaching, or testing; transported commercially; or exhibited to the public."

30.     Following the Envigo acquisition, Inotiv operates with two business segments, the Discovery and Safety Assessment ("DSA") segment and the Research Models and Services ("RMS") segment.

31.     The DSA segment provides preclinical research services on a contract basis directly to biopharma and pharmaceutical companies, as well as certain research products. The DSA segment provides clients with various services necessary to take a drug candidate through the early development process, such as screening and pharmacological testing, nonclinical safety testing, formulation development, regulatory compliance, and quality control testing. The DSA segment also assists clients with the identification, screening, and selection of lead compounds for drug development and "regulated and non-regulated (Good Laboratory Practice ('GLP') and non-GLP) safety assessment services."

32.     The RMS segment is comprised of the former Envigo businesses of research models, research model services, and Teklad brand animal diet, bedding, and enrichment products. Research animal production by the RMS segment includes the commercial production and sale of small research models (e.g., various varieties of purpose-bred rats, mice, and other rodents), large research models (including but not limited to non-human primates and beagle dogs), and the

production and sale of certain biological products. The RMS segment also provides research model services that include genetically engineered models and services, which include contract breeding and other services associated with genetically engineered research animals, care of client-owned animal colonies, and health monitoring and diagnostic services related to research animals. The Company's Teklad branded products include specialized animal diets and other products that are purported to "enhance the welfare of research animals."

### B.    Unbeknownst to Stockholders, Multiple Regulatory Inspections Uncovered Extensive Animal Welfare Violations at the Cumberland Facility

33.    Over a nearly 10-month period beginning prior to the Envigo acquisition, the USDA conducted five inspections of the Cumberland Facility and uncovered pervasive violations of the AWA. The regulator repeatedly cited Envigo for these violations and urged remedial action, which the Individual Defendants failed to heed and which they concealed from stockholders.

34.    On July 20-21, 2021, the USDA Animal and Plant Health Inspection Service ("APHIS") animal care unit conducted an unannounced inspection of the Cumberland Facility (the "July 2021 Inspection"). Following the July 2021 Inspection, the USDA prepared an Inspection Report ("the July 2021 Inspection Report") that identified the following violations of the AWA: (1) failure to provide adequate veterinary care; (2) failure to provide uncontaminated, palatable, and nutritive food in sufficient quantity; (3) failure to keep dogs safe; (4) exposing dogs to unsanitary and unsafe conditions; (5) failure to employ sufficient qualified employees; and (6) failure to make and retain accurate and complete records.

35.    More specifically, the July 2021 Inspection Report found the following examples of "Direct" noncompliance:

> 15 animals had medical problems that had not been identified or treated by the facility prior to the inspection.

*        *        *

13 nursing adult female beagles, housed in individual cages with their litters of 6-week old puppies (78 total), were fasted for 42 hours. . . . Deprivation of food causes stress, hunger, and anxiety. Placing the food where it can be seen, smelled, and in some cases touched by dogs while the dogs are fasting is causing unnecessary distress and anxiety.

\*        \*        \*

Puppies and adult dogs were housed in sheltered housing facilities in which the temperature inside the sheltered area exceeded 85 degrees Fahrenheit for at least 5 hours.

\*        \*        \*

In the G3 building, Rooms 1 and 2, the floors in the cages have a grid pattern with openings large enough for young puppies feet to pass through. There are approximately 200 puppies housed with their respective dams in indoor housing comprised of raised plastic-coated metal grate-type flooring. The grid pattern openings in the flooring allow the puppies feet to fall through the flooring up to their shoulders. . . . In Building G1, Room 3, an adult female beagle (CJICFN) was standing on the outside of the kennel. The dog's left front paw was caught in the raised plastic-coated grate flooring. Her two middle toes were caught in a thin rectangular opening in the grate floor and she was unable to free her foot. She was standing on her other three feet while panting rapidly and making small movements, as the other 3 dogs in the kennel jumped around her excitedly. It took two facility personnel approximately 3 minutes to free the dog's toes from the opening in the floor. Once the toes were free, the dog was examined more closely and the two toes were red and swollen.

\*        \*        \*

62 nursing female dogs (and a total of 393 puppies) in the whelping building (building 97) were housed in cages that did not provide the minimum amount of floor space for the dam and her litter as required by the Animal Welfare Act.

\*        \*        \*

Food in the self-feeders and feed silo in G1 building, and food in self feeders and storage areas in the G2 building were contaminated with a variety of live insects. Live small black worm-type insects were observed in the feed silo and in four self-feeders. Approximately 5 feeders contained live small black beetle-type inspects.

\*        \*        \*

Several animals were found in need of critical care. This included the puppy found by inspectors under the enclosure in the tray used for urine and feces collection and the adult dog with the toes entrapped in the slat flooring. Although both animals received care immediately, they were not identified by animal care staff responsible

9

for providing husbandry care. Two cage cards, and one puppy, were missing from nursery cages. Sheltered housing facilities were not being managed in accordance with the written temperature SOP. The facility currently employs 39 personnel for over 5000 dogs, and there are 5 vacancies which remain unfilled. Only one attending veterinarian is employed to oversee care for all of the dogs and cats well as assisting in research projects.

36.    A second section of the July 2021 Inspection Report identified the following examples of "Critical" noncompliance:

Mortality records show that during the time period from 01/01/2021 to 07/22/2021 over 300 puppy deaths were attributed to unknown causes, however, the facility has not taken additional steps to determine the causes of death in order prevent similar deaths of other puppies in the future.

\*       \*       \*

165 puppies under 5 weeks of age were found dead and the cause of death is identified as "unknown" in the medical records.

\*       \*       \*

The facility is not using official APHIS Forms 7005 and 7006 to record acquisitions and dispositions of dogs and cats.

\*       \*       \*

The facility has widespread problems with maintenance of primary enclosures, dog toys, and dog-contact surfaces:

\*\*\*There are plastic hanging doors in most of the sheltered housing runs in Buildings G1, G2, and G3. Approximately 90% of the plastic hanging doors have badly chewed edges with dirt and grime embedded in the edges. . . .

\*\*\*Metal kennel walls, gates, metal flashing surrounding the dog door flaps, heat lamps, and metal grates covering the waste troughs have excessive accumulations of rust and deterioration.

\*       \*       \*

Records show that during the time frame January 1, 2021 to July 22, 2021, 71 dogs were injured when a body part (such as an ear or tail) was pulled through the wall of the kennel by a dog in an adjacent kennel and bitten. The exact injury varied in each case, however substantial or minor, the dogs were subsequently euthanized. Although some enclosures had solid walls separating animals from the adjacent enclosure, the majority of kennels in the facility are constructed using either metal

wire or mesh to separate animals in adjacent enclosures. Dogs with body parts pulled through cage walls have experienced physical harm and unnecessary pain.

\*  \*  \*

The waste gutters below the main sheltered housing of Buildings G1, G2, and G3 contained a large accumulation of feces, urine, standing water, insects (both dead and alive) and uneaten food under the raised indoor and outdoor kennel floors. Near the outside gutters there is an overpowering ammonia and fecal odor that emanates from below the kennels. Inside the buildings, below the raised kennel floors there is an accumulation of feces, urine, insects (dead and alive), and food.

\*  \*  \*

There is an extensive, widespread pest problem throughout all animal-housing buildings at the facility.

37.    USDA inspectors set deadlines ranging from July 23, 2021 to August 31, 2021, by which time Envigo was directed to take corrective action with regard to these violations.

38.    However, Envigo failed to take corrective action, and the USDA cited many of these same violations at its next inspection on October 25, 2021 (the "October 2021 Inspection"). Specifically, the USDA determined that Envigo had failed to correct 11 areas of noncompliance, including the following "repeat" violations cited in the accompanying report (the "October 2021 Inspection Report"): (1) inadequate documentation of veterinary care; (2) failure to maintain a program of veterinary care that includes daily observations of animals to assess health and well-being; (3) failure to keep adequate acquisition and disposition records for animals; (4) failure to handle animals in a manner so as to avoid trauma, physical harm, or unnecessary discomfort; (5) insufficient cleaning of animal housing facilities; (6) failure to maintain floors in a manner that protects dogs' feet and legs from injury; (7) failure to separate fighting or incompatible dogs; (8) inadequate cleanliness and sanitation in primary enclosures; (9) inadequate pest control; (10) inadequate staffing; and (11) veterinary record-keeping violations.

39.    More specifically, the October 2021 Inspection Report provided the following descriptions of the violations listed above:

Three dogs had medical conditions that had not been identified or treated by the facility prior to the inspection.

\*        \*        \*

The facility still does not have complete acquisition or disposition records for their animals. Facility records, known as Inventory Change Notices, are used to record newborn puppy numbers, procedures performed, and changes in puppy numbers due to euthanasia or death. The facility continues to have animals which are no longer present for unknown reasons that they have stated to be clerical errors.

\*        \*        \*

Animals have not been handled as carefully and expeditiously as possible leading to subsequent death. . . . Mortality records show that a 7-week-old puppy (CLICBE) was found deceased on 21 Oct 2020 with its head stuck in the swinging kennel door of a bedded whelping run. Facility representatives state that an investigation of the incident was completed at the time, but they do not have access to the files from previous management. It was determined that the entrapment and subsequent death was a result of employee error.

\*        \*        \*

The facility has surfaces in contact with the dogs that are not being spot-cleaned frequently enough to prevent the buildup of grime and dirt and to reduce disease hazards

\*        \*        \*

The flooring in G2 which houses puppies from about 6 weeks and older still uses flooring that allows young puppies' feet and legs to pass though the openings.

\*        \*        \*

Even though this facility continues to have compatibility problems in their group housed animals, there has been no action taken by the facility to proactively identify and potentially house separately those dogs that are incompatible or have an aggressive disposition.

\*        \*        \*

The facility continues to have general sanitation problems with cleaning of enclosures, waste gutters, and odor control.

\*    \*    \*

There are still large numbers of dead flies and spiders noted throughout the facility especially in the corners of buildings, near drains, and in the storage areas. Additionally, some areas near drains have populations of small live black flies.

\*    \*    \*

The facility continues to have insufficient numbers of employees to successfully care for the animals. There continue to be severe staffing shortages and currently there are approximately 32 employees at the facility, with only 17 staff members directly responsible for all husbandry, daily observations, and medical treatments for almost 5000 dogs.

40.    For the violations observed during the October 2021 Inspection, USDA inspectors set deadlines for Envigo to take corrective action ranging from November 5, 2021 to November 8, 2021.

41.    According to the October 2021 Inspection Report com, USDA inspectors conducted an "exit briefing" with several Company personnel, including Defendant Wilbourn. The report also notes that a "Chief Operating Officer" was present at the exit briefing. Depending on the date of the exit briefing, which is not provided in the report, the "Chief Operating Officer" would have referred to Envigo's Chief Operating Officer James Harkness ("Harkness") or Defendant Sagartz.

42.    Thus, before Inotiv acquired Envigo, the Cumberland Facility had been inspected twice by the USDA and found to have repeated, egregious violations of the AWA that remained uncorrected.

43.    Days after the Envigo acquisition closed, USDA inspectors conducted another inspection of the Cumberland Facility on November 16, 2021 (the "November 2021 Inspection"). During that inspection, USDA inspectors found 26 categories of AWA violations, including ten "Direct Repeat" violations, four "Direct" violations, and five "Repeat" violations.

44. The "Direct Repeat" violations, which are detailed in the accompanying report (the "November 2021 Inspection Report") included: (1) failure of the attending veterinarian to oversee veterinary care; (2) dogs not receiving necessary veterinary care; (3) failure to maintain a program of veterinary care that includes daily observations to assess health and wellbeing; (4) violations of animal handling regulations; (5) failure to maintain enclosures so as to protect dogs from injury as a result of fighting; (6) failure to maintain safe flooring; (7) inadequate compatible grouping practices to prevent fighting between dogs; (8) violations of animal feeding requirements; (9) inadequate cleaning, sanitization, housekeeping, and pest control; and (10) failure to meet staffing requirements.

45. The "Repeat" violations included: (1) deficient record-keeping regarding acquisitions and dispositions; (2) failure to adequately maintain animal housing facilities; (3) inadequate cleaning, sanitization, housekeeping, and pest control; and (4) inadequate documentation of medical records.

46. The "Direct" violations included: (1) improperly constructed and maintained enclosures; (2) improperly small enclosures; (3) inadequate access to self-feeders and other food; and (4) inadequate veterinary care.

47. More specifically, the November 2021 Inspection Report provided the following examples of the violations listed above:

> The facility is not ensuring that the attending veterinarian has appropriate authority over medical care and euthanasia of dogs performed by staff members. Staff members that are trained and authorized to conduct euthanasia are not following approved procedures, resulting in the euthanasia of animals using methods that cause pain and discomfort.

*    *    *

> A total of 30 dogs present on inspection had severe dental disease and had not received adequate care to address this issue. Additionally, 12 of these dogs had concurrent issues which similarly had not received adequate veterinary care. These

14

additional issues included severe medical conditions of the ears, eyes, feet, skin, haircoat, and poor body condition.

*     *     *

A total of 34 dogs (in addition to those listed above) had medical conditions that were not identified or treated by the facility prior to the inspection.

*     *     *

The facility still does not have complete acquisition or disposition records for their animals. Facility records, known as Inventory Change Notices, are used to record newborn puppy numbers, procedures performed, and changes in puppy numbers due to euthanasia or death. The facility continues to have animals which are no longer present for unknown reasons that they have stated to be clerical errors.

*     *     *

The facility continues to have general sanitation problems with cleaning of enclosures, waste gutters, and odor control.

48.     For the violations observed during the November 2021 Inspection, USDA inspectors set deadlines for corrective action ranging from February 10, 2022 to April 1, 2022. According to the November 2021 Inspection Report, on December 17, 2021, USDA inspectors conducted an "exit briefing" with several Company personnel including Defendant Wilbourn.

49.     On March 8, 2022, USDA inspectors conducted a focused inspection of the Cumberland Facility (the "March 2022 Inspection"), observing five AWA violations, including two "Direct Repeat" violations and three "Repeat" violations. The "Direct Repeat" violations included: (1) inadequate slatted flooring; and (2) inadequate compatible grouping of animals. The "Repeat" violations included: (1) inadequate veterinary care; (2) inadequate construction and maintenance of animal housing facilities; and (3) inadequately maintained self-feeders.

50.     The accompanying report (the "March 2022 Inspection Report") provided the following examples of the above violations:

The facility continues to have construction and maintenance issues regarding enclosure design, stability and protecting the animals from injury. . . . The

enclosures are comprised of stainless steel or chain-link walls with a "tender-foot"-like flooring that is suspended above a waste gutter using long metal rods to provide support. Due to construction variability, the flooring frequently leaves gaps up to two inches along the front and/or sides of the enclosure. These gaps are large enough for a foot or leg to pass through the openings. Throughout the inspection, at least 130 enclosures had these gaps present and dogs were seen with toes in the gaps.

*     *     *

The facility continues to have compatibility problems amongst the adult dogs leading to 97 dogs receiving body and/or extremity injuries, some severe. During inspection by APHIS officials, an animal caretaker in Building G2 entered the treatment room with a beagle with a severe ear wound. The left ear was covered with fresh blood and had multiple skin tears requiring skin staples for repair.

*     *     *

The self-feeders at the facility are not being cleaned adequately and do not prevent molding, deterioration, and caking of feed.

51.    On May 3, 2022, USDA inspectors conducted a limited focused inspection of the Cumberland Facility (the "May 2022 Inspection"). The May 2022 Inspection focused primarily on the ongoing inadequacy of the facility's flooring, which continued to cause injury to animals as a result of the wide openings in the slatted design of the flooring. USDA inspectors again cited the Cumberland Facility for a violation of the AWA in connection with the inadequate flooring.

52.    According to the May 2022 Inspection Report, the inspection was "conducted with the Manager of Operations and the Vice President of North American Operations," Defendant Wilbourn, and an "exit interview" had been conducted with those personnel from the Company, as well as the Attending Veterinarian, Regional Quality Manager, Institutional Official/Chief Operating Officer, and Global Director of Quality Assurance.

C.    **The Individual Defendants Caused the Company to Issue Materially False and Misleading Statements**

1.    **September 2021 8-K and Conference Call**

53.    On September 21, 2021, during market hours, the Individual Defendants caused Inotiv to file with the SEC a Current Report on Form 8-K (the "September 2021 8-K") announcing that the Company had entered into a definitive agreement and plan of merger to acquire Envigo. Attached to the September 2021 8-K was an investor presentation (the "Investor Presentation") touting Envigo and its animal services and abilities. The Investor Presentation described Envigo as "a leading provider of high-quality research models and services to the biopharmaceutical, contract research, academic and government markets."

54.    The Investor Presentation also stated that Envigo "was formed and has grown to focus on ***research models and service ("RMS") excellence in core markets***" and that "***Envigo has strategically positioned itself as a leader in research models services in key research locations***."[1]

55.    The Investor Presentation then described Envigo's ability to provide customers with certain animals capable of meeting researchers' requirements for models with genetic consistency, stating that Envigo "***supplies customers with genetically consistent research models time after time***."

56.    A copy of the Agreement and Plan of Merger for the Envigo acquisition (the "Merger Agreement") was also attached as an exhibit to the September 2021 8-K. The Merger Agreement included statements asserting that, other than certain matters purportedly identified in disclosure schedules (which were not filed with the SEC as exhibits to the Merger Agreement),

---

[1] All emphasis is added, unless otherwise noted.

Envigo was in full compliance with applicable legal obligations. This included but was not limited to statements that Envigo "*is not, and since June 3, 2019 has not been, in violation in any material respect of any applicable Legal Requirement, including* the Food, Drug and Safety Laws, the applicable regulations promulgated thereunder, and *applicable guidance standards and policies issued by any Governmental Authority*," and that Envigo "*has not been the recipient of any of the following*: . . . (ii) establishment *inspection reports with findings of material deficiencies*, (iii) warning letters, and (iv) *other documents that assert any lack of compliance in any material respect with any applicable Legal Requirements or regulatory requirements* . . . ."

57.     That same day, the Company hosted a conference call to announce Inotiv's acquisition of Envigo (the "September 2021 Conference Call"). During the call, Defendant Leasure stated that Inotiv "*see[s] Envigo as a best-in-class provider of high-quality research models and services*" and that Envigo's "*dedication to quality*" made it an "excellent cultural fit for Inotiv."

58.     Then-CEO of Envigo, Adrian Hardy, stated on the September 2021 Conference Call that Envigo provides "*high-quality research-grade laboratory animals*." Defendants Leasure, Taylor, and Sagartz, who each participated on the September 2021 Conference Call, did not correct Hardy's statement.

59.     The Statements contained in ¶¶ 53-58 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading. Specifically, the Individual Defendants failed to disclose that: (1) the beagles from the Cumberland Facility were viewed as low-quality models and not as research-grade, high quality models due to the appalling conditions in which the dogs were housed and the pervasive compliance failures at the Cumberland Facility; (2) the Cumberland Facility was not in compliance with applicable regulations because

USDA inspectors had already cited violations of the AWA; and (3) Envigo's violations of the AWA were reasonably likely to expose Envigo to regulatory action and penalties and were therefore reasonably likely to harm the Company.

### 2. The Cumberland Facility Fact Sheet

60.    Upon closing of the acquisition of Envigo on November 5, 2021, the Company provided specific information regarding the Cumberland Facility on an Envigo-branded website in a document entitled, "Site Statistics, Envigo research products—Cumberland, VA canines"[2] (the "Cumberland Fact Sheet").

61.    The Cumberland Fact Sheet describes the Cumberland Facility and a number of specific conditions purported to be maintained there, suggesting compliance with the AWA and applicable regulations. These statements include:

> "*[t]he temperature in the general colony (sheltered) is 55-85ºF; whelping (indoor) is 68-82ºF*. . . . Temperature in the whelping building is monitored remotely on a *continuous basis* through alarms. . . . Temperature is *continuously monitored* by a security company . . . ."

> \*      \*      \*

> "*[g]eneral housing is pressure washed with 180º water and detergent every two weeks. Whelping caging is hand scrubbed daily*"

> \*      \*      \*

> "[t]he *feed bin storage area is cleaned weekly*."

> \*      \*      \*

> "*[a]ll dogs are fed* an open formula Purina Diet *ad libitum* [meaning, "as much or as often as necessary or desired"]. Whelping and puppies less than 8 weeks of age are fed a Purina Laboratory Canine Gestation/Lactation Diet. *Feed is primarily stored in bulk bins*."

---

[2] *See* https://insights.envigo.com/hubfs/resources/data-sheets/product-sheet_site-statistics-for-canines.pdf (last visited June 20, 2024).

\*       \*       \*

"[c]aging in general housing is suspended galvanized wire runs with plastic-coated rod flooring. In whelping, caging is suspended plastic or stainless steel walled caging with plastic-coated rod flooring and stainless steel mesh overlay."

\*       \*       \*

"***[p]olyethylene tubs [for whelping dams] are changed as needed and cleaned daily***,"

\*       \*       \*

"[s]havings are stored in sealed plastic wrapping on pallets in a dedicated storage building," while "[c]orrugated paper lining is stored on pallets in whelping building storage areas."

\*       \*       \*

"pedigree and ***health history information*** is maintained in the AS400 system," a computerized database.

62.     The statements in the Cumberland Fact Sheet were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose material adverse facts. Specifically, the Cumberland Fact Sheet failed to disclose that USDA inspectors: (1) had observed temperatures in animal housing exceeding the 85 degree legal limit at the Cumberland Facility; (2) had observed insufficient cleaning and sanitization practices; (3) found that dogs did not have sufficient access to food and water; (4) found repeated violations of the AWA in connection with the safety of flooring in animal housing areas; (5) found that the Company was failing to store food and bedding supplies properly; and (6) determined that the Company was not sufficiently maintaining records of dogs' health histories, including but not limited to the inadequate documentation of animal injuries, deaths, and other veterinary care issues, as well as the failure to maintain health and medical history information for hundreds of dogs that had been euthanized at the Cumberland Facility.

### 3.    The PETA Statement

63.    On November 11, 2021, the Company released a statement (the "PETA Statement") responding to a series of communications critical of the Cumberland Facility issued by PETA on November 9, 2021.

64.    On November 9, PETA had criticized the Company, including through the publication of video purportedly taken from inside the Cumberland Facility featuring, among other things, dogs confined to small spaces without stimulation, non-veterinarians performing medical procedures on dogs, a dog being euthanized without anesthesia, dogs being left in their cage while the cage was being pressure washed, puppies entrapped in gaps between the floor and the wall of the cage, and numerous dead puppies. The PETA video also included what were purported to be recordings of statements made by Envigo employees at the Cumberland Facility, including one who described defiance of USDA instructions regarding the feeding of dogs and another employee who referred to the USDA inspection process as "a damn game you gotta play to satisfy them because of the bullshit they [USDA] can make happen."

65.    The Company's PETA Statement was issued anonymously under the Envigo logo and titled, "Envigo Statement on PETA Report." The PETA Statement, which effectively denied PETA's criticisms of the Cumberland Facility, stated that:

> On November 9, 2021, PETA issued several communications claiming to have placed an infiltrator within Envigo's canine breeding facility in Cumberland, Virginia. It also published news and social media releases including edited video footage purportedly captured by this individual.
>
> PETA has made several accusations regarding our canine breeding facility and some of our staff. *Many of these allegations we know to be misleading and lacking important context*. However, any allegations towards our staff or our company are taken seriously, and *we have launched an investigation to assess whether any improper actions occurred within the facility*.

66.     The PETA Statement discussed recent USDA inspections, but downplayed the regulator's findings and Inotiv purported to take remedial action:

> Envigo has recently participated in two separate USDA inspections at our Cumberland site. ***We are incorporating the feedback from these visits into operational enhancements already underway***. As part of our mission for continuous improvement, the company has invested more than $3 million over the past five years in ***extensive upgrades and facility improvements to our Cumberland location***, which include a new outdoor play area, a new heating system, upgrading enclosure panels, new digital radiography equipment, and upgrades to whelping (birthing) enclosures. ***The highest quality of animal welfare is a core value of our company and is central to our business***.

67.     The statements in ¶¶ 63-66, omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 59.

### 4.      The USDA Statement

68.     In response to the USDA's release of its report of the July 2021 Inspection on November 15, 2021, the Company issued a statement on November 16, 2021 (the "USDA Statement"). The USDA Statement was issued anonymously under the Envigo logo and titled, "Envigo Statement on USDA Inspections November 16, 2021."

69.     The USDA Statement, which downplayed the seriousness of the USDA's findings, did not address the long—and still ongoing—history of similar problems at the Cumberland Facility, and provided excuses for certain of the USDA's findings, stated as follows:

> Envigo has recently participated in two separate USDA inspections at our Cumberland site. While the USDA inspections reflected that we have improvements to make, we had previously initiated and are ***continuing to take the necessary corrective actions for all issues outlined in the reports***. We appreciate the information provided, take the feedback seriously, and recognize the improvements we are ***making are an ongoing effort***.

> As part of our mission for continuous improvement, the company has invested more than $3 million over the past five years in ***extensive upgrades and facility improvements to our Cumberland location***, which include a new outdoor play area, a new heating system, upgrading enclosure panels, new digital radiography equipment, and upgrades to whelping (birthing) enclosures. ***The highest quality of animal welfare is a core value of our company and is central to our business***.

The initial inspection visit took place in July and temperatures at that time of year in this part of Virginia are naturally high. Our team is conducting due diligence on installing a cooling system, but in the meantime, we have added additional fans and cooling/misting options. We anticipate moving forward with a new cooling system in 2022. The insect issue has been a challenge as our operations are in a rural area. We acknowledge we need to be more diligent in ensuring our food storage areas are as pest-free as possible. We recently changed the contractor we utilize for pest control and are working with the new contractor to rectify the problem.

In response to the medical issues raised in the inspections, we continue to strive to do better. ***After the USDA visited our facility, we immediately began to address the concerns and develop treatment programs for all animals identified. We do not neglect our animals and are committed to ensuring any sick animal receives the proper care they deserve***.

Our mission at Envigo is to help our customers realize the full potential of their scientific and medical research, which ultimately contributes to significant improvements in the lives of both humans and animals. We remain steadfast in our commitment to advancing science and operating to the highest professional and welfare standards.

70.    The statements in the USDA Statement were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 59. The statements in the USDA Statement were also false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the further reasons that USDA inspectors had continued to find, during the October 2021 Inspection and the November 2021 Inspection, that the Company was not taking sufficient corrective actions to address the USDA's findings and was not providing the "highest quality of animal welfare," through the persistence of serious "Repeat" and "Direct Repeat" violations of the AWA and new AWA violations demonstrating an ongoing failure to provide for the health and wellbeing of the beagle dogs and puppies at the Cumberland Facility as detailed at ¶¶ 33-52, above.

### 5.    November 2021 Virtual Conference

71.    On November 16, 2021 Defendant Leasure participated in the Jefferies London Healthcare Virtual Conference, held by the investment firm Jefferies (the "Jefferies Conference"). Defendant Taylor also was present on behalf of the Company.

72.    During the Jefferies Conference, Defendant Leasure spoke to investors about the Company, its history, and its business prospects. As part of his presentation, Defendant Leasure discussed the "transformative" recent acquisition of Envigo and touted the benefits of Envigo's business as addressing "some of the risk we had to our business model, our growth, our continuing acquisition strategy."

73.    Notably, Defendant Leasure stated that, "[o]ne of the key things is what are we going to do for supply chain in our access to research models, which is becoming more and more of a problem and more is like limiting resource." Leasure then stated that Envigo, "does breeding, it does boarding, it does contract breeding and boarding, and then roughly sell research models," which provides the Company "access to resources that we did not have," including "access to all the research models." Leasure emphasized this point as an advantage over the Company's competitors, noting that, other than Charles River Laboratories, "we're the only CRO [contract research organization] that has access to all the research models," which provided a "real competitive advantage right now with the supply and demand chain where it is today."

74.    Defendant Leasure's statements made at the Jefferies Conference were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading. Specifically, Defendant Leasure failed to disclose that the Company's access to a source of beagle dogs, the preferred breed for research purposes, was threatened by the serious and ongoing AWA violations at the Cumberland Facility.

### 6.    December 2021 10-K

75.    On December 21, 2021, Defendants Leasure, Taylor, Davis, Johnson, Sagartz, Neff, Brown, and Cragg signed and caused Inotiv to file its annual report on Form 10-K for the period ended September 30, 2021 (the "2021 10-K"). The 2021 10-K touted Envigo's purported "high standards of animal welfare" stating in relevant part:

_Envigo's Competitive Strengths_

We believe that Envigo is well positioned to capitalize on favorable trends in the research industry and provide differentiated solutions to our customers based on the key competitive strengths set forth below:

. . .

Commitment to animal welfare. ***Envigo is on the forefront of humane care of laboratory animals*** and implementation of the "3Rs" (Replacement, Reduction and Refinement). ***Envigo maintains high standards of animal welfare as evidenced by its strong compliance record with regulators across the globe.*** Envigo frequently advises our customers in matters relating to animal welfare, including enrichment, housing and animal husbandry.

\*       \*       \*

_Industry Support and Animal Welfare_

Envigo is committed to delivering first-class health and genetic quality, operational performance and customer service. ***High standards of animal welfare are vital to each of these, and so are integral to Envigo's business success.***

***Envigo has been at the forefront of animal welfare improvements and the humane care of laboratory animals.*** Envigo is a leading advocate for implementation of the 3Rs (Replacement, Reduction and Refinement). Members of Envigo's scientific and technical care staff undertake continuing professional development in the field of laboratory animal science, with special focus to animal welfare and the 3Rs, and they are encouraged to publish and present within the scientific community.

Envigo has formed an internal Institutional Animal Care and Use Committee, comprising staff from many disciplines within Envigo, in addition to external representation, ***to comply with applicable regulations and provide strict oversight of animal welfare matters.*** Envigo's animal production facilities in the U.S. and the Netherlands, are accredited by the Association for Assessment and Accreditation of Laboratory Animal Care International ("AAALAC"), a private, non-profit, international accrediting organization that promotes the humane

treatment of animals in science through voluntary accreditation and assessment programs. ***Envigo's facilities are routinely inspected by government agencies tasked with enforcing animal welfare regulations.*** …

Laboratory animals remain an essential component in the research and development that our customers conduct. They further our knowledge of living systems and help in the discovery and development of products that can save or enhance people's lives. ***Envigo works with the scientific community to improve our understanding and promote best practice in the care and welfare of research animals. As providers of research models to the research community, Envigo is responsible to our customers and the public for the health and well-being of the animals in our care.***

76.    Under a section titled "Regulatory Matters," the 2021 10-K stated that "Envigo is regularly consulted and inspected by the relevant national authorities in order to ensure continued compliance with the legal requirements in each nation in which it operates." The 2021 10-K also stated that Envigo was appealing certain non-compliance findings without discussing the ongoing nature of these violations and the repeated failure to remediate them, stating:

We are subject to periodic inspections by regulatory authorities which could lead to enforcement actions if those authorities determine that our facilities or procedures do not meet applicable requirements.

***We are subject to periodic inspections by regulatory authorities, including the FDA and the USDA.*** As part of these inspections, the regulatory authorities seek to determine whether our facilities and operations comply with applicable laws and regulations. Adverse findings as a result of these inspections could lead to enforcement actions, including substantial fines, warning letters that require corrective action (including potential facilities improvement requirements), revocation of approvals, exclusion from future participation in government healthcare programs, criminal prosecution and even the denial of the right to conduct business. ***During the period from July through December 2021, one of the Envigo's U.S. facilities was inspected on several occasions by the USDA.***

***Following the inspection, USDA issued inspection reports with findings of noncompliance with certain USDA laws and regulations. Envigo formally appealed certain of the findings and the USDA has indicated it intends to conduct a formal investigation.*** The inspections and/or the investigation could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation. The imposition of any of these penalties or other restrictions on our business as a result of the inspections could adversely affect our business reputation

26

and could have a material adverse impact on our financial condition, results of operations and stock price.

77.    The statements in ¶¶ 75-76, omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 59.

### 7.    February 2022 Virginia Senate Testimony

78.    On February 3, 2022, Defendant Wilbourn testified before the Virginia Senate Agriculture, Conservation and Natural Resources Committee's Companion Animals Subcommittee (the "Virginia Senate Hearing"). Video of the Virginia Senate Hearing was posted on the Virginia Senate's public website. The Virginia Senate Hearing was called to address proposed state legislation that would, among other things, impose state animal welfare inspection requirements and other regulations on the breeders of research animals. The legislative proposals were introduced, in large part, due to outrage over conditions at the Cumberland Facility that began following release of drone footage of the Cumberland Facility taken in July 2019, when the Cumberland Facility was owned by Envigo's predecessor, Covance Research Products ("Covance").

79.    Defendant Wilbourn testified as a representative of Envigo. During her testimony before the Virginia Senate Hearing, Wilbourn stated that she was "the Vice President of North American operations in Envigo," which Wilbourn described as the "second largest breeder of animals in research and the second largest breeder of canines for research." Wilbourn testified that she is "responsible for ensuring the proper and lawful operations of our facilities in North America, including the canine facility in Cumberland." Wilbourn further stated that, "*we at Envigo and I personally take that responsibility* [for ensuring proper and lawful operations] *seriously and maintain a commitment to the highest animal welfare standards*."

27

80.     Defendant Wilbourn testified regarding the results of the July 2021 Inspection and October 2021 Inspection, stating that "*we were deeply disappointed in the results of our USDA inspection for Cumberland in July and October of this year*." Wilbourn further testified that, just like what had occurred following an "unfavorable" 2017 USDA inspection of the Cumberland Facility that occurred "prior to Envigo's ownership" (after which the violations were corrected and the facility received a series of "clean inspections with no noncompliant items identified in 2018 and 2019"), the Company was "*working hard to fix the current issues and [has] already taken many steps towards doing so*."

81.     On two occasions during her Virginia Senate Hearing testimony, Wilbourn minimized the seriousness of the systemic and ongoing violations identified by the USDA, calling them "*temporary lapses*" that Wilbourn blamed solely on the COVID-19 pandemic. First, in describing the cause of the violations identified by the USDA, Wilbourn stated that a combination of more dogs (due to decreased demand from customers) and fewer workers onsite "led to some *temporary lapses and challenges in the quality of animal care that we've always offered and are committed to offering*." Near the end of her testimony, Defendant Wilbourn again downplayed the systemic and ongoing nature of these violations, emphasizing, "*[t]he temporary lapse in providing the level of care we are used to providing, caused by COVID and our desire not to euthanize hundreds of dogs, is just that: temporary. We are doing everything we can to make sure that the animals in our charge are well cared for*."

82.     Defendant Wilbourn also sought to defend Envigo's failure to remedy the violations identified in the July 2021 Inspection Report and claimed that the Company acted "immediately" to address the "specific problems identified" by the USDA. Wilbourn testified: "*Although we acted swiftly*, many of the corrective actions take some time and several months to implement and

see the results. That's why the second inspection report that was released last Friday from an inspection in October 2021—just three months after the first, in July—still identified problems that had not been fully addressed, but ***showed improvement***." Moreover, Wilbourn provided examples of the "all hands on deck exercise" claimed to have been undertaken by the Company to take "***numerous measures to address the specific animal welfare issues identified***" by the USDA, including completing "***over 2,700 veterinary exams***" and "***almost 2,000 dental exams***," as well as the implementation of "***procedures to better track animals in need of veterinary support***," "***increased cleaning efforts***," and "***the physical plant has been upgraded by improving flooring and cages***."

83.    Defendant Wilbourn then showed members of the Virginia Senate present at the Virginia Senate Hearing images purporting to show, among other things, the "***great condition of the dogs***," as well as the conditions of "some of the housing that our animals are in." With respect to animal housing, Wilbourn pointed out "boarding" being used to address problems with "gaps in flooring" identified by the USDA, while noting that "grid flooring" is still being used in all areas to allow "***urine and fecal material [to] go through the grids***." Wilbourn also noted that "we are changing all of our galvanized chain link [enclosures] to stainless steel [panels]," stating that the Company would "ready to place an order mid-February to finish the site." Defendant Wilbourn also touted the Company's purported improvement of cleaning of the dogs' living areas, describing a "***rough hose every day***" of cages, as well as "***full sanitization with hydrogen peroxide cleansers to disinfect on a regular basis***." Prior to concluding, Defendant Wilbourn noted that "over the past few years, Envigo has invested more than $3 million to improve the Cumberland Facility, including canine housing, heaters," and other equipment, adding that "this year, we've been given $5 million to invest in the facility" to make additional improvements.

84.     The statements made by Defendant Wilbourn at the Virginia Senate Hearing in ¶¶ 79-83, including with respect to the Company's purported commitment to the highest animal welfare standards and descriptions of the USDA's findings as "temporary lapses" were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 59.

85.     Additionally, the statements made by Defendant Wilbourn at the Virginia Senate Hearing in ¶¶ 79-83 were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because the USDA had found multiple instances of ongoing and serious AWA violations at the Cumberland Facility that persisted through the November 2021 Inspection that, as described at ¶ 48 herein, had been disclosed to Defendant Wilbourn by USDA inspectors during an exit briefing on December 17, 2021. Defendant Wilbourn's testimony at the Virginia Senate Hearing did not address *any* of the USDA's findings from the November 2021 Inspection indicated that the ongoing and serious nature of the AWA violations at the Cumberland Facility, including but not limited to persistent violations of veterinary care standards, violations regarding the condition of flooring, animal housing and feeding requirements, and recordkeeping violations that indicated that the AWA violations at the Cumberland Facility were not "temporary lapses" that were temporally limited in nature.

86.     Moreover, the statements Defendant Wilbourn made at the Virginia Senate Hearing set forth in ¶¶ 82-83—the purported corrective actions—were false and misleading when made, and omitted to state material facts necessary to make the statements not misleading because those statements either were directly contradicted by or otherwise failed to disclose specific findings from the most recent inspection of the Cumberland Facility, the November 2021 Inspection (of which Defendant Wilbourn was informed, *see* ¶¶ 43-48), and/or addressed issues that the USDA

would soon discover to constitute ongoing AWA violations during the March 2022 Inspection (*see* ¶¶ 49-50), including USDA inspectors: (1) found "Direct Repeat" animal welfare violations due to dogs that had "severe dental disease" and had not received adequate care; (2) continued to find "Direct Repeat" and "Repeat" violations of recordkeeping requirements; (3) found a "Direct" violation of the AWA during the November 2021 Inspection regarding flooring at the Cumberland Facility; (4) continually found numerous cleaning and sanitization violations, including "Repeat" violation; and (5)  continued to observe serious dog fights and dogs with traumatic wounds and other serious medical conditions.

### 8. February 2022 10-Q

87.    On February 16, 2022, the Company filed its quarterly report on Form 10-Q for the first quarter of 2022 with the SEC ("Q1 2022 10-Q"). Defendants Leasure and Taylor signed the Q1 2022 10-Q. Attached to the Q1 2022 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Leasure and Taylor.

88.    The Q1 2022 10-Q contained the following statement regarding the USDA's inspections:

> During the period from July through December 2021, one of Envigo's U.S. facilities was inspected on several occasions by the [USDA]. USDA issued inspection reports with findings of non-compliance with certain USDA laws and regulations. Envigo formally appealed certain of the findings. USDA has indicated it intends to conduct a formal investigation. The inspections and/or the investigation ***could*** lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation. As of December 31, 2021, no investigation has been initiated.

89.    With respect to the Company's RMS segment, the Q1 2022 10-Q noted that the segment "***breeds, imports and sells research-quality animal models*** . . . ."

90.    The statements in ¶¶ 87-89 were false and misleading when made and omitted to state material facts necessary to make the statements not misleading for the same reasons set forth above in ¶ 59.

91.    Additionally, the statements in ¶¶ 87-89 were false and misleading when made and omitted to state material facts necessary to make the statements not misleading because the USDA continued to find ongoing violations during the November 2021 Inspection that led to—and were found to persist at—both the March 2022 Inspection and the May 18, 2022 raid of the Cumberland Facility. Specifically, as alleged herein at ¶¶ 49-50, the March 2022 Inspection found a total of five AWA violations, including two "Direct Repeat" violations and three "Repeat" violations. As alleged herein in ¶¶ 101-105, government agents and investigators assisting with the May 18, 2022 raid discovered numerous ongoing failures to comply with the AWA consistent with conditions first observed in the July 2021 Inspection.

### 9.    May 2022 10-Q

92.    On May 16, 2022, Inotiv filed its quarterly report on Form 10-Q with the SEC (the "Q2 2022 10-Q") for the period ended March 31, 2022. Defendants Leasure and Taylor signed the Q2 2022 10-Q. Attached to the Q2 2022 10-Q were SOX certifications signed by Defendants Leasure and Taylor. Regarding an unspecified Envigo facility, the Q2 2022 10-Q stated:

*Government Investigations*

During the period from July 2021 through March 2022, one of Envigo's U.S. facilities was inspected on several occasions by the U.S. Department of Agriculture ("USDA"). USDA issued inspection reports with findings of non-compliance with certain USDA laws and regulations. ***Envigo formally appealed certain of the findings, and has made multiple remediations and improvements at the facility, of which it has kept USDA apprised.*** USDA has indicated it intends to conduct a formal investigation. The inspections and/or the investigation could lead to enforcement action resulting in penalties that could include a temporary restraining order or injunction, civil and/or criminal penalties, and/or license suspension or revocation. As of the 10-Q filing date, no investigation had been initiated.

93.     The above statements were materially misleading because they failed to disclose that: (1) Envigo was already on notice of existing violations of applicable regulations at its Cumberland Facility; (2) Envigo had failed to remediate these violations when given the opportunity to do so; and (3) the continued violations were reasonably likely to expose Envigo to regulatory action.

**D.    The Truth Emerges**

94.     On May 18, 2022, federal and state law enforcement officials executed a search and seizure warrant at the Cumberland Facility, at which point the officials observed numerous AWA violations, including 145 dogs and puppies found to be in "acute distress" and in need of immediate veterinary care.

95.     On May 19, 2022, the U.S. Attorney's Office and the DOJ Environment & Natural Resources Division, Wildlife & Marine Resources Section, filed a Complaint for Declaratory and Injunctive Relief against Envigo and a motion for a temporary restraining order in the action styled as *United States of America v. Envigo RMS, LLC*, No. 6:22-cv-00028-NKM (W.D. Va.) (the "DOJ Action"). On May 20, 2022, Inotiv filed a current report on Form 8-K with the SEC disclosing both the execution of the search and seizure warrant and the filing of the DOJ Action.

96.     On May 21, 2022, Judge Moon of the Western District of Virginia issued a Temporary Restraining Order, granting the government's motion on an *ex parte* basis. That same day, Judge Moon issued an Amended Temporary Restraining Order (the "Amended TRO"), finding that "the Government has provided sufficient evidence that Envigo is engaged in serious and ongoing violations of the Animal Welfare Act, and that an immediate temporary restraining order must issue to put a halt to such violations pending further proceedings."

97.     The Amended TRO stated that "Over 300 beagle puppies have died onsite due to 'unknown causes' over seven months. Many were not given anesthesia before they were

euthanized by intracardiac injection." Moreover, "[n]ursing female beagles were denied food, and so they (and their litters) were unable to get adequate nutrition." Judge Moon stated "[t]he list of serious violations of the Animal Welfare Act and its regulations goes on and on." Citing the "overwhelming evidence" provided by the DOJ, the order found that "Envigo has consistently failed, despite repeated warnings and opportunities for correction, to meet its obligations under AWA's implementing regulations to provide adequate veterinary care."

98.    The Amended TRO ordered Envigo's compliance with specific AWA requirements that Envigo had consistently failed to meet according to USDA inspection reports. These included: ensuring that only compatible dogs are housed together; ensuring that every beagle is provided with sufficient uncontaminated, wholesome, palatable food; compliance with the requirement for flooring found in the AWA; installation of solid partitions between adjacent enclosures; providing contact information for the attending veterinarian as well as a compliant program of veterinary care, as well as other compliance with medical recordkeeping requirements; documentation of dogs or puppies found to have injuries attributable to or consistent with a fight or wounds of unknown causes; and having a licensed veterinarian conduct necropsies and document the cause of any animal death.

99.    Envigo was also ordered to cease "disposing of any beagle" by transfer from the Cumberland Facility or euthanasia without the consent of the government or court order and to "cease breeding, selling, or otherwise dealing in beagles at the Cumberland Facility, until in full compliance with this order."

100.    On this news, the Company's share price fell $5.19, or 28%, to close at $13.14 per share on May 23, 2022.

101.    The government officials who executed the search and seizure warrant at the Cumberland Facility provided sworn declarations that were filed in the DOJ Action. Those declarations echo the reports USDA inspectors compiled following the July 2021, November 2021, March 2022, and May 2022 inspections.

102.    One such declaration was submitted by Dr. Samantha Moffitt, DVM ("Dr. Moffitt"), the Lead Veterinarian assisting the federal government's efforts in executing the search warrant at the Cumberland Facility. According to the declaration Dr. Moffitt provided in support of the government's motion for preliminary injunction, during the execution of the warrant from May 18, 2022 to May 22, 2022, she determined that a total of 446 beagles were in "acute distress."

103.    Dr. Moffitt's declaration provided extensive detail as to the reasons for many of these findings, including: beagles suffering from severe dental disease that required teeth to be extracted; dogs with broken and silver-stained teeth that were likely the result of dogs chewing on the metal kennel bars; "severe pododermatitis or inflammation of the skin on the paw pads and between the digits"; dogs with infected and/or fresh puncture wounds and ear injuries that were indicative of dogs fighting; and  dogs with distended bellies indicating that they had worms.

104.    Another such declaration was provided by Amy Katherine Taylor ("Ms. Taylor"), an investigator in the Animal Law Unit of the Virginia Office of the Attorney General. Ms. Taylor served as the "lead building and enclosure assessor" assisting in the execution of the search warrant from May 18, 2022 to May 22, 2022. Ms. Taylor's declaration states that she observed: "overcrowded enclosures" in one building, while at the same time "at least 20 empty enclosures in [another] building"; "empty enclosures that contained dried feces as well as old bedding and shavings"; "[dogs] exhibiting behavior indicative or resource guarding in front of the feeders"; strong odors; hot, muggy temperatures; enclosures made of grates that allowed for the feet and

toes of beagles to slip through; enclosures with cobwebs, rat and mice droppings, insects, and dead cockroaches; and contaminated food.

105.    On June 8, 2022, Ms. Taylor returned to the Cumberland Facility to determine whether Envigo had complied with the requirements set forth in the Amended TRO. Ms. Taylor's declaration explained that, at that time, she observed: temperatures in housing areas that exceeded 85 degrees, including recorded temperatures of 90 degrees; a "guillotine door containing very sharp edges"; black mats installed over the grated flooring that were not porous and allowed for the pooling of liquids, including urine and feces; beagles with veterinary issues, including bite wounds; dogs fighting within their enclosures; puppies not being provided with potable water; and food bowls with kibble that could be turned over by the beagles, exposing the food to feces left on the mats.

106.    In response to the DOJ's motion for a preliminary injunction, Envigo filed a brief on June 13, 2022, revealing that it had "repeatedly expressed to counsel for the United States its willingness to close its Cumberland, Virginia facility once it is permitted to do so." Later that same evening, the Company issued a press release announcing that it would be closing the Cumberland Facility rather than make "[t]he required investments to improve the facility." The press release indicated that the closure was due to the significant investments required to improve the facility. Specifically, the Company's press release stated:

> Robert Leasure, Jr., Inotiv's President and Chief Executive Officer commented, "Since the Envigo acquisition in November 2021, the Cumberland, Virginia, facility was recognized as needing improvements and investments. Inotiv has been pleased with the continued and significant progress in improvements at the Cumberland facility since the acquisition, as evidenced by recent inspections by the USDA and other auditing organizations. We sincerely appreciate our customers', employees', and third-party input to date in support of this facility. ***The required investments to improve the facility and the lead time to achieve these improvements have recently increased. As a result, we have decided we will not be investing further in this facility, and it will be closed.*** We will implement an

orderly closure plan. Cumberland comprises less than 1% of our total Inotiv revenue and has not contributed to profits in our Research Models and Services segment since the acquisition."

107.    On this news, the Company's share price fell $0.25, or 2%, to close at $12.78 per share on June 14, 2022.

108.    On June 24, 2022, the Company announced that Harkness, the Company's Chief Operating Officer, Research Models & Services, would be retiring from the Company, effective September 30, 2022. Prior to Inotiv's acquisition of Envigo, Harkness had served as Chief Operating Officer of Envigo. During the due diligence process prior to the acquisition, Harkness participated in a meeting with Defendants Leasure and Sagartz in New York to provide a "corporate overview" of Envigo that covered multiple aspects of Envigo's business, including assets, strategy, operations, financial position, marketing and business development, and commercial agreements. Harkness also accompanied Defendants Leasure, Sagartz, and Wilbourn on the visit to the Cumberland Facility as part of the due diligence process in 2021.

109.    On July 14, 2022, the Company and the DOJ filed a settlement agreement, in the form of a proposed Consent Decree, in the DOJ Action (the "DOJ Settlement"). As part of the DOJ Settlement, Envigo agreed to "permanently refrain from any activity requiring an AWA license" at the Cumberland Facility. The parties to the DOJ Settlement also filed a proposed Transfer Plan that would provide for the safe, humane, and efficient transfer of the approximately 4,000 beagles that remained housed at the Cumberland Facility that would be coordinated by the Humane Society of the United States. On July 15, 2022, Judge Moon approved the DOJ Settlement and entered the Consent Decree.

110.    On May 13, 2024, Inotiv filed a notice that it could not timely file its second quarter 2024 quarterly report due to "the current status of negotiations between the Company and the DOJ regarding a potential resolution" of the investigation into the Cumberland Facility. Specifically,

one of the "principal analyses" related to the amount of any accrual recorded for the potential resolution of the matter. On this news, the Company's stock price fell $2.05, or nearly 50%, to close at $2.12 per share on May 14, 2024.

111. On May 15, 2024, Inotiv announced that it had reached an agreement-in-principle to resolve the investigation by the DOJ into the Cumberland Facility. The Company recorded a $26.5 million charge related to this agreement, which caused Inotiv to report a net loss of $48.1 million for second quarter 2024.

112. On June 3, 2024, the DOJ announced that Inotiv will pay $35 million, including an $11 million fine for AWA violations, to resolve its investigation into the Cumberland Facility.

**E.    The Individual Defendants Knew, or Consciously Disregarded, the Animal Welfare Concerns at the Cumberland Facility**

113. In connection with the Board's due diligence prior to the Envigo acquisition, the Individual Defendants should have been aware of the July 2021 and October 2021 Inspections, including the USDA's findings from those inspections. Moreover, given that Defendants Leasure, Sagartz, and Wilbourn visited the Cumberland Facility as part of their tour of Envigo's facilities in July and August of 2021, they witnessed and/or were informed of the poor conditions and inhumane treatment at the Cumberland Facility and of the fact that the facility was not compliant with the legal and regulatory requirements governing the treatment of animals bred for research purposes. As Judge Simon already held, "the conditions for which the company was cited were open and notorious." *In re Inotiv, Inc. Sec. Litig.*, 2024 WL 1344784, at *22 (N.D. Ind. Mar. 29, 2024).

114. Moreover, earlier reports indicating that animal welfare violations were occurring at the Cumberland Facility would also have made the Individual Defendants aware of the problems even prior to visiting the facility.

(a)      In July 2019, an animal welfare group called Showing Animals Respect & Kindness ("SHARK") released drone video footage of the Cumberland Facility, which was then owned by a predecessor of Envigo's known as Covance. According to a July 11, 2019 posting on the SHARK website, SHARK used drones to gain "an unprecedented view of the miserable conditions to which the beagles at Covance are subjected."[3] In addition to posting the video, SHARK posted the text of a letter that it sent to Labcorp, the parent company of Covance. The letter states, "our drone filmed overcrowded cages filled with stressed dogs, cages littered with feces, and dogs suffering from stereotypic behaviors." SHARK further wrote that the filming occurred "on multiple days," meaning that the issues observed represented a "present and ongoing crisis."

(b)      The SHARK video footage was picked up by media outlets. On July 23, 2019, Kerri O'Brien ("O'Brien"), a reporter at the Richmond, Virginia television station WRIC published a report titled, "'Truly Barbaric': Viral video of dogs warehoused for research raising concerns."[4] O'Brien's article quotes a SHARK investigator, Stuart Chaifetz ("Chaifetz"), who participated in the drone surveillance of the Cumberland Facility as stating, "[t]he first thing you notice is the endless crying and wailing and barking. Terribly, terribly sad." Chaifetz further described the conditions found by SHARK, stating, "[t]hese cages were filthy there were feces and urine all over it. We actually filmed one dog eating, you know, some of it." The article also noted that the SHARK video "highlights aggressive dogs." O'Brien also noted that Covance had sold

---

[3] *See* https://www.sharkonline.org/index.php/past-shark-updates/1900-shark-s-drone-video-exposes-labcorp-beagle-breeding-facility (last visited June 20, 2024)

[4] *See* https://www.wric.com/news/truly-barbaric-viral-video-of-dogs-warehoused-for-research-raising-concerns/ (last visited June 20, 2024).

the Cumberland Facility to Envigo in July 2019 and that Envigo did not respond to requests for comment.

      (c)    O'Brien continued to report on developments related to the Cumberland Facility. On October 29, 2019, she reported for WRIC TV and published a report on the WRIC website titled, "Inspection report at facility that warehouses dogs for research draws concern."[5] O'Brien's TV report featured visuals from the 2019 SHARK drone video and other video and photographs from the Cumberland Facility showing dogs in rusty, filthy cages, sick and injured dogs, and insect-infested dog food. O'Brien reported that WRIC had received a copy of an August 2017 USDA inspection report that included images that "show dogs and puppies, some sick and hurt. All of the animals confined to rusty wire cages, many sitting in their own filth," as well as inspectors' findings that there were "bugs crawling through the dogs' food."

      (d)    On February 5, 2020, O'Brien reported for WRIC TV and published another report on the WRIC website, "Virginia could end the breeding of cats and dogs for the purpose of experiments."[6] The report noted that Virginia legislators had proposed legislation that would "essentially shutter the controversial dog breeding facility in Cumberland," which O'Brien noted then housed "more than 2,000 puppies and adult dogs."

    115.    Additionally, the Individual Defendants actively opposed legislation imposing requirements on commercial research animal breeders, which further demonstrates their awareness of the applicable animal cruelty laws and highlights the reputational harm from the Cumberland Facility's compliance failures. Specifically, when Virginia's 2022 legislative session opened in

---

[5] *See* https://www.wric.com/news/taking-action/inspection-report-at-facility-that-warehouses-dogs-for-research-draws-concern/ (last visited June 20, 2024).
[6] *See* https://www.wric.com/news/taking-action/virginia-could-end-the-breeding-of-cats-and-dogs-for-the-purpose-of-experiments/ (last visited June 20 2024).

January 2022, a series of bills were introduced, referred to as the "Beagle Bills" that sought to, among other things, bring commercial research animal breeders under the state's animal cruelty laws, require that breeders put up animals for adoption before euthanizing them, and impose various recordkeeping requirements. Though the Beagle Bills were later unanimously approved, the Individual Defendants participated in a concerted lobbying effort to prevent them from passing. The Virginia Coalition for Beagle Protection ("VCBP") on February 27, 2022 tweeted, "Envigo's CEO/President/Director Robert Leasure (compensation $1,306,233), was recently in Richmond to 'crisis manage' the #beagle protection bills with high-dollar influential lobbying firm McGuireWoods and @SenDaveMarsden. Hmm." The previous day, VCBP had tweeted that "Envigo has retained high-priced influential lobbying firm McGuireWoods to try and kill or amend the bills to be meaningless, even though the bills, if passed, would require such simple things."[7]

116.    In addition, on April 21, 2022, the Humane Society of the United States issued a report, "Undercover investigation reveals animal suffering in toxicology laboratory," that described the findings of an undercover investigator who "spent seven months inside Inotiv" and witnessed the use of animals in toxicology studies at an Indiana research facility. Among other things, the report discussed the compliance failures at the Cumberland Facility. Moreover, though "[b]eagles are the dog of choice for use in laboratory testing because they are friendly and submissive," Inotiv's own researchers preferred beagles purchased from Marshall Farms because the dogs from the Cumberland Facility "'suck' because they are frightened and unsocialized."

---

[7] Lobbyist registration forms filed with the Virginia Conflict of Interest and Ethics Advisory Council confirm that McGuireWoods (through an entity called McGuireWoods Consulting LLC) was retained by Envigo from 2020-2022; the lobbying disclosure forms did not change to reflect retention by Inotiv in 2022, after it acquired Envigo.

117.     As evidenced above, the animal welfare problems at the Cumberland Facility were well documented and publicized, meaning that the Individual Defendants would have been in receipt of information reflecting the true facts regarding the ongoing AWA violations at the Cumberland Facility. Therefore, the Individual Defendants knew or recklessly disregarded that, contrary to Inotiv's representations to the investing public, Envigo's animal welfare practices, compliance with applicable regulations, and/or the risk to the Company's principal source of research models put the Company at risk of financial and reputational harm. In doing so, the Individual Defendants breached their fiduciary duties to the Company.

118.     Defendant Wilbourn, who then served as Envigo's Vice President of North American Operations, was present at the visits made by Inotiv personnel or otherwise knew of the conditions at Envigo's facilities at the time of the due diligence process and at all relevant times.

119.     On June 24, 2022, the Company abruptly announced that Harkness, the Chief Operating Officer of the RMS segment that is comprised of the acquired Envigo businesses would be retiring effective September 30, 2022. Prior to Inotiv's acquisition of Envigo, Harkness had served as Chief Operating Officer of Envigo and participated in the due diligence process prior to the Inotiv acquisition.

**F.     The Individual Defendants Cause Inotiv to Issue a Materially Misleading Proxy Statement**

120.     On October 5, 2021, Defendants Leasure, Davis, Johnson, Sagartz, Neff, and Cragg caused Inotiv to issue a definitive proxy statement ("2021 Proxy Statement") soliciting stockholder votes in advance of the special meeting to be held November 4, 2021 to vote on conditions necessary to effectuate the merger of Inotiv and Envigo. Specifically, the 2021 Proxy Statement solicited stockholder approval in favor of four management proposals, including: (i) an amendment to the Company's articles of incorporation to increase the number of authorized shares to 75

million ("Authorized Share Increase Proposal"); (ii) approve the issuance of common shares pursuant to the merger agreement ("Merger Share Issuance Proposal"); and (iii) an amendment to the 2018 Equity Incentive Plan (the "2018 EIP") to increase the number of common shares available for awards thereunder by 1.5 million shares. The consummation of the Envigo acquisition is conditioned on stockholder approval of the Authorized Share Increase Proposal and the Merger Share Issuance Proposal.

121. Defendants Leasure, Davis, Johnson, Sagartz, Neff, and Cragg solicited stockholder approval of the Envigo acquisition citing, among other things, "[t]he Board's knowledge . . . of Envigo's business, operations, financial condition, earnings and prospects, taking into account the results of Inotiv's due diligence review of Envigo[.]" As to Envigo's operations, the 2021 Proxy Statement stated, in relevant part:

**Envigo Overview**

***Envigo is primarily a products business that provides research-quality animals*** for use in laboratory tests, as well as standard and custom laboratory animal diets and bedding and other associated services for contract research organizations, biopharmaceutical companies, universities, governments and other research organizations. ***It provides customers with laboratory animals used in basic research and product development and non-clinical testing of compounds to support the development and approval of new medicines.*** Utilizing its portfolio of products, Envigo enables its customers to create a more flexible product development model and reduce their costs, enhance their productivity, and increase speed to market. ***Envigo's vision, working together to build a healthier and safer world, includes helping its customers meet certain regulatory requirements*** in order to bring life-saving and life-enhancing new medicines to patients.

Envigo is a leading commercial provider of RMS [Research Models and Services] products and services globally and has been supplying research models since 1931. . . .

Envigo's RMS business is comprised of (1) Research Models, (2) Diets and Bedding, and (3) Research Model Services.

*Research Models.* The research models business is comprised of the commercial production and sale of laboratory animals and research models, principally purpose-bred rats and mice and large animal models (NHPs, canines and rabbits)

for use by researchers. Envigo provides models to numerous customers around the world, including many academic institutions, government agencies, biopharmaceutical companies, and contract research organizations. Envigo has a global footprint with production facilities strategically located in six countries. ***Its operations are located in close proximity to its customers, enabling Envigo to provide consistent customer service with a high degree of focus on animal welfare.***

122.    The 2021 Proxy Statement purported to warn that any failure to comply with

governmental regulations could harm Envigo's business.

> ***Failure to comply with applicable governmental regulations could harm our business.***
>
> ***Envigo is subject to a variety of governmental regulations***, particularly in the United States, Europe, and the United Kingdom, relating to animal welfare and the conduct of our business, including … U.S. USDA Animal Welfare Regulations. ***Our facilities are therefore subject to routine formal inspections by regulatory and supervisory authorities***, including the U.S. FDA, the U.S. USDA and the U.K. Home Office, as well as by representatives from customer companies.
>
> ***Envigo expends significant resources on compliance efforts.*** Regulations and guidance worldwide concerning the production and use of laboratory animals for research purposes continue to be updated. … Similarly, guidance has been and continues to be developed for other areas that impact the biomedical research community on both a national and international basis, including transportation, import and export requirements of biological materials, and animal housing and welfare. Certain of our customers may require us to comply with any new guidance in advance of our implementation as a condition to being awarded contracts. ***Conforming to new guidelines may result in increased costs attributable to adding or upgrading facilities, the addition of personnel to address new processes and increased administrative burden.***

123.    The 2018 EIP authorizes the issuance of shares of the Company's common stock

for equity awards to Inotiv's employees and directors. As of October 4, 2021, the 2018 EIP had

396,167 shares of common stock available for future grant pursuant to the plan. Equity pursuant

to the 2018 EIP is effectively awarded at the discretion of the Board, according to the 2021 Proxy

Statement:

> *Administration.*   The Committee has the authority and responsibility to administer the Amended Plan, except for awards to non-employee directors, which are administered by the Board. The Committee consists solely of not less than two

members intended to be "non-employee directors" within the meaning of Rule 16b-3 of the Securities Exchange Act of 1934, as amended, "outside directors" under regulations promulgated under Section 162(m), and "independent directors" under NASDAQ rules. The Committee may exercise broad discretionary authority in the administration of the Amended Plan, including the authority to determine the treatment of awards upon an employee's retirement, disability, death, or during a leave of absence. In addition, the Committee is authorized to delegate some or all of its ministerial duties to one or more of its members or to one or more employees or agents of the Company.

124. The 2021 Proxy Statement solicited stockholder approval of an amendment to the 2018 EIP to increase the number of shares of common stock reserved for issuance thereunder by 1.5 million shares. If approved, the total number of shares reserved for issuance would be 1,896,167, which represents 11.8% of the Company's common stock outstanding as of October 4, 2021.

125. The 2021 Proxy Statement was materially misleading because it failed to disclose that: Envigo was already on notice of existing violations of applicable regulations at its Cumberland Facility; Envigo had failed to remediate these violations when given the opportunity to do so; and the continued violations were reasonably likely to expose Envigo to regulatory action. A reasonable shareholder would have found the truth to be material when deciding to vote for or against these proposals.

126. On November 5, 2021, Inotiv filed a Form 8-K with the SEC disclosing the results from the votes on the proposals contained in the 2021 Proxy Statement. In particular, Authorized Share Increase Proposal, the Merger Share Issuance Proposal, and the amendment to the 2018 EIP were approved. These approvals based on the misleading statements contained in the 2021 Proxy Statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and their continued enrichment at the expense of the Company's unaffiliated stockholders.

## VI.    DENIAL OF THE MOTION TO DISMISS THE SECURITIES CLASS ACTION

127.    On March 29, 2024, Judge Simon denied the motion to dismiss the Securities Class Action, sustaining claims under Section 10(b) against defendants Leasure, Taylor, Sagartz, and Wilbourn, Section 20(a) against defendants Leasure and Taylor, and Section 14(a) against defendants Inotiv, Leasure, and Taylor. *See generally In re Inotiv, Inc. Sec. Litig.*, 2024 WL 1344784 (N.D. Ind. Mar. 29, 2024).

128.    Defendants had a "duty to disclose in light of the detailed facts alleged indicating that the civil and criminal investigations into Envigo's and OBRC's sketchy operations were real and pressing concerns likely to result in significant financial and reputational harm to the company." *Id.* at *17. Even if they did not have an affirmative duty to disclose, defendants "assumed one by providing some information about the Envigo and OBRC acquisitions, its new RMS business segment, the Cumberland facility, and its primate business, but intentionally omitting others." *Id.* at *18. Their disclosure obligation arose from the months-long, pervasive compliance issues at the Cumberland facility that existed amid defendants' due diligence and facility tours of Envigo facilities, such that "it was entirely predictable to the powers at be that the company would not be able to bring the facility into compliance (and perhaps avoid an enforcement action) while meeting the financial goals the company was projecting." *Id.* at *18.

129.    The Court rejected defendants' argument that they adequately disclosed material information. Specifically, "based on what Defendants said pertaining to the Envigo acquisition, it's hard to see how a buyer could beware (let alone be aware of) the risks posed by the acquisition." *Id.* at *19. The statements cited by defendants were "essentially boilerplate," noting "opaque things like Envigo was subject to governmental regulations (who isn't?!)," and "left out a significant amount of information about the appalling conditions at the Cumberland facility." *Id.*

130.   Due to the executives' personal knowledge of the violations and their tours of the facilities, the Court rejected defendants' argument that the case was an attempt at fraud-by-hindsight. *Id.* at *21. That argument "ignores Plaintiff's allegations that inspectors first identified the violations . . . in *July 2021*" and that "with each set of findings, the company was cited for violations and its top executives were told in no uncertain terms that it would take to fix the violations (*i.e.*, things they determined were financially unpalatable, in closing the facility)." *Id.* Moreover, "Leasure, Sagartz, and Wilbourn personally toured the Cumberland facility *at the very time* the repeated violations took place" and "the conditions for which the company was cited were open and notorious." *Id.* at *22 (emphasis in original). In context, these compliance issues were material.

131.   The Securities Class Action adequately pled that Defendants Leasure, Taylor, Sagartz, and Wilbourn issued the statements with requisite scienter. *Id.* at *26-30. Leasure and Sagartz had overseen the due diligence prior to the Envigo acquisition, including touring the facility while the USDA had cited "open and notorious AWA violations scattered across the facility." *Id.* at *27. The conditions "included overpowering odors from visibly accumulated animal waste and other unclean conditions, dogs fighting and injured due to fighting, dogs kept in overcrowded enclosures, facilities that were obviously in disrepair (such as the persistent flooring and flooding issues inspectors repeatedly documented), and a galling lack of staffing to care for the thousands of dogs living at the Cumberland facility." *Id.* at *27. "In other words, they were things to be on alert for at a site visit in Cumberland during a due diligence 'tour.'" *Id.*

132.   As to violations of Section 14(a), Judge Simon held that the 2021 Proxy Statement contained material omissions for the reasons discussed with respect to the Section 10(b) claim. *Id.*

at *33. Causation was sufficiently pled because plaintiff alleged "when and by how much Inotiv's stock dropped" after the corrective disclosures in November 2021 and May 2022. *Id.* at *34.

## VII.    DAMAGES TO THE COMPANY

133.    As a direct and proximate result of the Individual Defendants' conduct, Inotiv has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)    $35 million to resolve the DOJ investigation into the Cumberland Facility;

b)    Costs to remediate the ongoing violations of the AWA at the Cumberland Facility;

c)    Any funds paid to settle the Securities Class Action; and

d)    Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Inotiv.

134.    In addition, Inotiv's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired. The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

135.    The actions complained of herein have irreparably damaged Inotiv's corporate image and goodwill. For at least the foreseeable future, Inotiv will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Inotiv's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

136.    Plaintiffs bring this action derivatively in the right and for the benefit of Inotiv to redress injuries suffered, and to be suffered, by Inotiv as a direct result of the wrongdoing alleged

herein. Inotiv is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.    Plaintiffs will adequately and fairly represent the interests of Inotiv in enforcing and prosecuting its rights.

138.    Plaintiffs have continuously been shareholders of Inotiv at times relevant to the wrongdoing complained of and are current Inotiv shareholders.

139.    When this action was filed,[8] Inotiv's Board consisted of Defendants Leasure, Davis, Johnson, Sagartz, Neff, Brown, and Cragg. Plaintiffs did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### A.    A Majority of the Board Faces a Substantial Likelihood of Liability For Issuing A Materially Misleading Proxy Because The Entire Board Purportedly Conducted Due Diligence Prior to the Envigo Acquisition

140.    The entire Board is charged with overseeing the Company's affairs and purported to conduct due diligence prior to approving the acquisition of Envigo. Inotiv first explored a potential acquisition of Envigo in November 2019 when Defendant Leasure met with Defendant Cragg (then a member of Envigo's Board) as part of "an ongoing effort to meet leaders in the industry and ongoing efforts to evaluate strategic opportunities." Discussions continued until May 2021 when Defendants Leasure and Cragg discussed the preliminary considerations of a business combination of the two entities and entered a mutual nondisclosure agreement. Shortly thereafter, due diligence activities began.

---

[8] This action was commenced on September 9, 2022 when the first member action in this consolidated action was filed.

141.    Then, on June 17, 2021, Defendants Cragg, Leasure, Sagartz, and members of Envigo's management team met to discuss the potential acquisition. Defendant Cragg and Envigo's management "provided a corporate overview of Envigo that covered multiple aspects of Envigo, including assets, strategy, operations, financial position, marketing and business development, and commercial agreements." Similar meetings were held throughout the month "to review business opportunities, organization opportunities, outline strategic opportunities and synergies for a combined company."

142.    Defendant Leasure updated the Board on the status of due diligence and potential deal structure for Envigo on July 2, 2021 and July 7, 2021. On July 12, 2021, Defendant Leasure emailed an initial non-binding indication of interest letter to Defendant Cragg. On July 14, 2021, Defendant Leasure met with Defendant Cragg and Hardy, Envigo's then-CEO to discuss "strategic issues related to the proposed transaction, organizational issues, additional due diligence issues, and further deal structuring issues."

143.    According to the 2021 Proxy Statement, on July 20, 2021, Defendants Leasure, Sagartz, and Wilborn "began a due diligence tour to visit multiple Inotiv and Envigo sites." Between July 20, 2021 and August 20, 2021, Defendants Leasure, Sagartz, and Wilbourn, along with other Inotiv and Envigo executives, visited 17 of the 22 Envigo facilities around the country. Around this time, the USDA conducted the July 2021 Inspection and found that the Cumberland Facility housed dogs in unsanitary and unsafe conditions, including facilities that exceeded 85 degrees Fahrenheit and grid flooring whereby puppies fell through the floor up to their shoulders. The July 2021 Inspection Report also found that over 300 puppy deaths in a six-month period were attributed to unknown causes; the primary enclosures were rusty, dirty, and grimy; the main housing buildings reeked from a large accumulation of feces, standing water, uneaten food; and

extensive, widespread pest problem throughout the facility. As described in the USDA reports of inspections of the Cumberland Facility and the declarations of individuals who participated in the execution of the federal search warrant between May 18-20, 2022, the overcrowded and filthy conditions at the Cumberland Facility would have been ***impossible to miss***.

144.    According to the 2021 Proxy Statement, on September 17, 2021, management updated the Board on the due diligence conducted to date, and on September 21, 2021, Inotiv and Envigo announced the proposed merger in which Inotiv would acquire Envigo for a total of $485 million. Therefore, the entire Board was informed of the egregious hazards at the Cumberland Facility and had reason to know of the July 2021 Inspection Report.

145.    Moreover, the entire Board had reason to know that the findings in the July 2021 Inspection Report were longstanding compliance failures. The Cumberland Facility was the subject of investigative reporting since 2019 that used drones to document the overcrowded, filthy cages that led to distressed and aggressive dogs, not the friendly and submissive nature of beagles ordinarily used in laboratory testing. Thus, the entire Board was on notice that the Cumberland Facility failed to comply with the AWA.

146.    Nevertheless, the entire Board issued the 2021 Proxy Statement, which stated that "Envigo is subject to a variety of governmental regulations," that the "facilities are therefore subject to routine formal inspections," and that "Envigo expends significant resources on compliance efforts." These statements were materially misleading because they omitted to disclose that Envigo had already been subject to a recent investigation by the USDA, that the agency had found critical compliance failures, and that these failures had existed for so long that the cost of compliance would be significant. Due to the Board's misleading proxy solicitation, the Company was harmed.

B.    **A Majority of the Board Faces a Substantial Likelihood of Liability for the Issuance of Materially Misleading Statements**

147.    The entire Board signed and issued the 2021 10-K, which stated that between July and December 2021, "one of the Envigo's U.S. facilities was inspected on several occasions by the USDA" and that the "USDA issued inspection reports with findings of noncompliance with certain USDA laws and regulations," which findings were being appealed. By issuing these statements, the entire Board concedes that it has knowledge of the USDA's inspection reports.

148.    However, these statements in the 2021 10-K significantly understated the severity of the compliance failures, thereby providing stockholders with a materially misleading impression about the state of the facility and resulting risk of regulatory action. The 2021 10-K did not even identify the Cumberland Facility as the facility that had been repeatedly inspected. This is significant because media reports had already drawn attention to the egregious violations at the Cumberland Facility, but the Individual Defendants had downplayed those reports by issuing (or failing to correct) the Cumberland Facility Fact Sheet, the PETA Statement, and the USDA Statement—all of which sought to falsely assure stockholders that the Board was taking corrective action because "[t]he highest quality of animal welfare is a core value [that] is central to our business." By failing to identify the Cumberland Facility as the site of repeated violations that the Company appealed and issuing affirmative statements of purported "corrective actions," the Individual Defendants (including the entire Board) continued to conceal the longstanding, pervasive compliance failures at the Cumberland Facility and misled stockholders about the significant risk of regulatory action.

C.    **The Entire Board Faces a Substantial Likelihood of Liability for Failure to Take Remedial Action**

149.    The misconduct alleged herein relates to Inotiv's core business operations, including but not limited to the production or importation of research animals. The Company's

RMS segment—which comprises the Envigo businesses acquired by the Company—accounts for approximately three quarters of the Company's revenues.

150.    The importance of operations at the Cumberland Facility to Inotiv was further demonstrated by matters addressed in the Declaration of Defendant Sagartz submitted in opposition to the DOJ's motion for preliminary injunction on June 13, 2022. These facts included, but are not limited to, the fact that the Cumberland Facility historically "has produced up to 25 percent of the beagle dogs used domestically in the development of new medicines." According to Sagartz, the use of "purpose-bred beagle dogs" produced at the Cumberland Facility was "essential for biomedical research and the development of lifesaving drugs and medical devices," and was specifically "instrumental to evaluating the efficacy and safety of novel medicines, including those designed to treat various cancers and autoimmune disorders amongst other conditions."

151.    In light of the foregoing, compliance with regulations such as the AWA was "mission critical" for Inotiv. In the 2021 10-K, the entire Board admits that it was on notice of the inspection reports issued by the USDA. Therefore, the entire Board knew that—for nearly one year—the Company had been repeatedly warned of unsanitary conditions at the Cumberland Facility that directly impacted the dogs' quality of life and, in turn, made them unsuitable for lab-grade research. According to one report, Inotiv's own researchers preferred to use dogs from another farm because the Company's beagles were frightened, unsocialized, and hard to work with. Therefore, the compliance failures at the Cumberland Facility not only had a risk of regulatory penalties but also a risk of revenue loss, as customers fulfilled their need for laboratory animals through other vendors.

152.    Each of the USDA's reports identified corrective action for Inotiv to implement before the provided deadlines. The entire Board failed to take these corrective actions, as evidenced

by the USDA's identification of the same violations, in growing severity, over the course of several months. The failure to take corrective action caused Inotiv harm, and the entire Board faces a substantial likelihood of liability as a result.

**D.    Additional Reasons Demand is Excused**

153.    Leasure is the Company's CEO and therefore is not independent under NASDAQ listing rules. As an employee, Leasure derives substantially all of his income from his employment with Inotiv, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or his fellow members of management with whom he works on a day-to-day basis. He is also named as a defendant in the Securities Class Action. As a result, demand is futile as to him.

154.    Brown and Cragg were appointed to the Board by certain stockholders who collectively held 72.6% of the outstanding voting stock of Envigo. Prior to their service on Inotiv's Board, they served as directors of Envigo and thus knew or should have known of the ongoing violations at the Cumberland Facility, but failed to disclose the same. As a result, demand is futile as to them.

<u>**COUNT I**</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

155.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

156.    The Individual Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Inotiv's business and affairs, particularly with respect to issues as fundamental as public disclosures.

157.    The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual

Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Inotiv.

158.    In breach of their fiduciary duties owed to Inotiv, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

159.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report Company's overall prospects.

160.    As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, Inotiv has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II

**(Against Defendants Leasure and Taylor for Contribution
for Violations of Sections 10(b) and 21D of the Exchange Act)**

161.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

162.    The conduct of Defendants Leasure and Taylor, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

163.    Inotiv is named as a defendant in related securities fraud lawsuit that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If Inotiv

is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

164.    As officers, directors and otherwise, Defendants Leasure and Taylor had the power or ability to, and did, control or influence, either directly or indirectly, Inotiv's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

165.    Defendants Leasure and Taylor are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

166.    Defendants Leasure and Taylor have damaged the Company and are liable to the Company for contribution.

167.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company.

## COUNT III

**(Against Defendants Leasure, Davis, Johnson, Sagartz, Neff, and Cragg for Violations of Section 14(a) of the Exchange Act)**

168.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

169.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances

under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on October 5, 2021 violated §14(a) and Rule 14a-9 because it solicited stockholder approval for the Authorized Share Increase Proposal, Merger Share Issuance Proposal, and amendments to the 2018 EIP while failing to disclose material facts about Envigo's business.

170.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

171.    The misrepresentations and omissions in the 2021 Proxy Statement were material to Company shareholders in voting on the 2021 Proxy Statement. The 2021 Proxy Statement solicited stockholder votes for: (i) Authorized Share Increase Proposal; (ii) Merger Share Issuance Proposal; (iii) amendment to the 2018 EIP; and (iv) approval of the issuance of common shares related to the conversion of certain senior notes. The proxy statement was an essential link in the accomplishment of the continuation of Defendants' continued violation of their fiduciary duties.

172.    The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Inotiv, demand judgment as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of Inotiv and that Plaintiffs are adequate representatives of the Company;

B.    Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties;

C.    Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Inotiv;

D.    Directing Inotiv to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inotiv and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.    a proposal to strengthen Inotiv's oversight of its disclosure procedures;

4.    a provision to control insider transactions; and

5.    a provision to permit the stockholders of Inotiv to nominate at least three candidates for election to the Board;

E.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that Plaintiffs on behalf of Inotiv have an effective remedy;

F.    Awarding to Inotiv restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by them;

G.    Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Dated: June 24, 2024

By: ___/s/ Brad A. Catlin___
**WILLIAMS LAW GROUP, LLC**
Brad A. Catlin, Atty No. 21570-29
1101 North Delaware Street, Suite 200
Indianapolis, IN 46202
Tel: (317) 633-5270
Fax: (317) 426-3348
brad@williamsgroup.law

*Liaison Counsel for Plaintiffs*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Erica Stone
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
philkim@rosenlegal.com
estone@rosenlegal.com

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
745 Fifth Avenue, Fifth Floor
New York, New York 10151
Telephone: (212) 935-7400
bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
rprongay@glancylaw.com
prajesh@glancylaw.com

*Co-Lead Counsel for Plaintiffs*

**THE PORTNOY LAW FIRM**
Lesley F. Portnoy
1800 Century Park East, Suite 600

Los Angeles, CA 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional counsel for Plaintiff William Noble Burkhart*

## VERIFICATION

I, Sergio Grobler, do hereby verify that I am a holder of stock of Inotiv, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Consolidated Amended Stockholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 6/23/24

_____
Sergio Grobler

DocuSign Envelope ID: FE0E4723-FA88-47E1-86AA-413CCCACB80C

## **VERIFICATION**

I, William Noble Burkhart, do hereby verify that I am a holder of stock of Inotiv, Inc., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Consolidated Amended Stockholder Derivative Complaint ("Complaint"). I have authorized the filing of the Complaint. I have reviewed the Complaint. All of the averments contained in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 6/7/2024

DocuSigned by:

06344B9D03C74E9

William Noble Burkhart